[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1145 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1146 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1147 
 On Application for Rehearing
The opinion of April 18, 2003, is withdrawn, and the following is substituted therefor. *Page 1148 
Waddell Reed, Inc.; Waddell Reed Financial, Inc.; Waddell Reed Financial Services, Inc.; WR Insurance Agency, Inc.; and WR Insurance Agency of Alabama, Inc. (hereinafter referred to collectively as "WR"), appeal from a judgment entered on a jury verdict in favor of United Investors Life Insurance Company ("UILIC") and from the trial court's order denying WR's postjudgment motions. We affirm in part, reverse in part, and remand.
 I. Facts and Procedural History
As part of its services, UILIC issues various types of insurance policies, including variable-annuity insurance policies. A variable-annuity insurance policy is an investment vehicle that combines aspects of insurance and securities. All of the WR defendants are financial services organizations. WR sold and serviced the variable-annuity insurance policies issued by UILIC. At the outset of the relationship, UILIC and WR were related corporations under the common ownership of a parent company, Torchmark Corporation. Torchmark had acquired UILIC and WR in the early 1980s. As of May 1, 1990, UILIC and WR entered into a principal underwriting agreement ("PUA"), which authorized WR to sell and service UILIC variable-annuity insurance policies and also provided that WR would receive a commission on each policy sold.
While the PUA expressly permitted WR and UILIC to deal with other entities, during the time WR and UILIC were subsidiary corporations of the same parent company, as a practical matter, neither party was free to deal with other entities with respect to the business of supplying their clients with variable-annuity insurance policies. In other words, while the companies were related, WR was not free to recommend that a policyholder exchange his or her UILIC policy for that of another insurance company.
After a spin-off in 1998, WR became an independent company; it began looking at variable-annuity products offered by other companies while continuing to work with UILIC on developing new products.[1]
WR contends that the UILIC variable-annuity insurance policies it had sold over the years had become outdated. In the meantime, UILIC began negotiating with a new company to perform the functions being carried out by WR. When UILIC learned that WR was searching for companies offering new products, it entered into negotiations with WR concerning their relationship. UILIC contends that before the negotiations began, WR threatened mass replacement of the existing UILIC variable-annuity insurance policies WR was servicing with those of another company. UILIC wanted some restriction on WR's ability to offer replacement policies to UILIC policyholders.
A critical point in the negotiations took place during early July 1999. On July 7, UILIC'S chief executive officer, Anthony McWhorter, and WR's chief executive officer, Robert Hechler, spoke twice by telephone. During those conversations, according to both participants, UILIC agreed to increase WR's annual compensation to 25 basis points on new business and to pay 20 basis points on existing business; in essence, UILIC agreed to pay again for policy sales for which it had previously compensated WR.[2] UILIC *Page 1149 
says it agreed to do so to eliminate the risk of losing existing business by WR's replacing policies. The new compensation arrangement was scheduled to take effect January 1, 2000. UILIC also agreed to develop a new variable-annuity insurance policy that WR could promote instead of or in addition to the policy WR claims was outdated.
The parties differ over what was said during the telephone conversations about restrictions on policy replacements. According to Hechler, he specifically refused the anti-replacement provisions. According to McWhorter, Hechler recognized the necessity for restrictions on replacements and did not object to such restrictions being imposed. McWhorter also says that Hechler agreed to amend the PUA to include anti-replacement language. In a letter from McWhorter to Hechler written on July 8, the day after the telephone conversations, the parties agreed that WR would be compensated for both old and new business. The letter begins by describing its content as dealing with "some details of the agreement that we reached over the telephone" and ends by saying that it "fully describes the items that we discussed regarding compensation and product features." The letter was silent as to anti-replacement provisions. The letter was signed by both McWhorter and Hechler on behalf of their respective companies.
UILIC later requested a more formalized contract, and the parties exchanged drafts. UILIC proposed an outright ban on policy replacements, while WR proposed language containing no restriction on replacements. For several months after July 1999, attorneys for UILIC and WR exchanged drafts of amendments to the PUA. Some of those drafts included language written by WR dealing with restrictions on replacements. UILIC offered evidence indicating that it was lulled into complacency while WR "dragged its feet" and that during this time WR had a hidden agenda of mass replacement of UILIC policies. When the parties failed to agree upon a new contract, WR told UILIC that it would treat the July 8, 1999, letter as the parties' definitive agreement. UILIC insisted that it needed protection against widespread policy replacements.
On January 26, 2000, Keith Tucker, chairman of WR's board of directors, wrote a letter addressed to C.B. Hudson, chairman of Torchmark's board of directors. Tucker stated: "I hope that you will accept our good faith promise not to replace your [UILIC's] policies issued to our clients in lieu of the agreement you have proposed [restricting WR's ability to replace UILIC's variable-annuity insurance policies]." Tucker further stated that WR had "no intention of replacing any policy issued by [UILIC], either now or in the future, unless circumstances require us to consider such a drastic measure." UILIC says that, in view of those assurances, it took no steps to educate its policyholders regarding potential policy-replacement efforts. At trial, Hechler said he never intended to agree to contract terms restricting WR's capacity to replace UILIC policies.
WR Target Funds, Inc. ("Target Funds"), was a mutual-fund company under the management of the officers of WR. When policyholders paid premiums to UILIC, UILIC purchased mutual-fund shares in Target Funds pursuant to elections by the policyholders. UILIC held the shares in its name in trust for the *Page 1150 
policyholders. UILIC received 90 basis points of compensation per policyholder for administrative expenses; this type of compensation is known as mortality and expense charges ("ME charges"). Each month, Target Funds redeemed enough mutual-fund shares purchased by UILIC on behalf of its policyholders to pay that month's ME charges owed to UILIC. The proceeds from redeeming the shares were placed in Target Funds' bank account at United Missouri Bank ("UMB"), after which an amount of money equal to the month's ME charges was wire-transferred from Target Funds' UMB account to a UILIC bank account. UILIC then paid WR the compensation it was due.
Beginning in February 2000, officers of WR, acting in their capacities as managers of Target Funds, began diverting money from the ME charges owed to UILIC to pay the sums WR claimed were due under the July 8, 1999, letter, retroactive to January 1, 2000. From January 2000 through April 2001, those officers caused more than $10,000,000 to be paid directly to WR from the proceeds due UILIC for ME charges.
UILIC sued the five WR entities on May 3, 2000, requesting injunctive relief, a judgment declaring the parties' rights and liabilities under any contracts between the parties, and money damages for breach of contract, conversion, and tortious interference with business relations. UILIC later amended its complaint to charge fraudulent suppression, deceit, and misrepresentation. WR filed a counterclaim against UILIC seeking a judgment declaring that the July 1999 letter was a binding contract that entitled WR to certain specified compensation and seeking damages for fraud, breach of contract, and unjust enrichment.[3] Notwithstanding the pending litigation, the business relationship between WR and UILIC continued, and WR continued to sell UILIC variable-annuity insurance policies, including a new policy UILIC developed called the Advantage Gold policy.
Later in 2000, WR entered into an agreement with Nationwide Life Insurance Company pursuant to which WR began selling Nationwide variable-annuity insurance policies. As previously noted, under the terms of the PUA, WR had no obligation to sell only UILIC's variable-annuity insurance policies. WR's contract with Nationwide allowed WR to continue selling UILIC's policies. UILIC presented evidence indicating that WR was secretly evaluating Nationwide as a potential replacement for UILIC as early as September 1999, at a time when UILIC contends that WR was representing to it that it intended to maintain a "long-term relationship" with UILIC.
UILIC also presented evidence indicating that before July 1999, WR had evaluated three strategic options with regard to its relationship with UILIC. A chart outlining the options WR considered was admitted as one of UILIC's exhibits at trial. According to the chart, option 1 contemplated an ongoing exclusive relationship; option 2 called for WR to maintain a relationship with UILIC while also recruiting other vendors of variable-annuity insurance policies to replace UILIC's products; and option 3 contemplated *Page 1151 
terminating the relationship. According to UILIC, WR adopted option 2 and set out to find a new partner in the variable-annuity insurance market. A document prepared by WR and admitted as one of UILIC's exhibits at trial stated that WR wanted to establish a "[p]artnership in [an] aggressive migration strategy," specifically offering a new variable-annuity partner the "[o]pportunity to migrate — or, potentially, purchase — [a] book of $3b.+ [more than $3 billion]" of existing variable-annuity business. According to UILIC, option 2 was the plan Hechler threatened in June 1999 to implement, that he pledged not to carry out in July 1999, and that Tucker's January 2000 letter promised not to implement.
From November 2000 through May 2001, WR aggressively pursued replacement of UILIC policies with Nationwide policies. UILIC contends that replacing the policies created a new sales commission for WR and a new surrender period for the policyholder. UILIC offered evidence indicating that WR salespeople had engaged in questionable sales tactics (such as spreading rumors that UILIC would soon be facing bankruptcy, when that was not the case) and that many of the policy replacements were not in the best interest of the policyholders. UILIC contends that the mass replacements constituted consummation of the threat WR made in 1999, notwithstanding a subsequent declaration, acknowledged by WR in the July 1999 letter whereby UILIC agreed to increase WR's compensation, that WR had "withdrawn its consideration of possible relationships on attractive terms with other third party insurance companies in order to establish a long-term relationship with [UILIC]."
UILIC terminated the PUA on February 28, 2001, effective April 30, 2001, almost one year after litigation had begun. UILIC says it terminated the PUA because WR's clients had begun to replace the earlier version of the UILIC variable-annuity insurance policies with Nationwide policies in January 2001. Much confusion followed. Effective May 1, 2001, WR and SAL Financial Services, Inc. ("SAL"), WR's successor as the principal company selling and servicing UILIC's variable-annuity insurance policies, entered into an agreement obligating WR to continue servicing its clients who had UILIC variable-annuity insurance policies.
On April 5, 2001, the trial court entered a partial summary judgment in favor of UILIC. The trial court held:
 "[W]hatever obligation exists, if any, on the part of [UILIC] to pay compensation of 20 basis points on in-force variable annuity policies issued by [UILIC] and distributed by [WR] on or before December 1, 1999, terminates as of the effective date of termination of the PUA, i.e., April 30, 2001 and [WR] is not entitled to receive any such compensation after that date."
WR petitioned this Court for a writ of mandamus directing the trial court to vacate its partial summary judgment; this Court denied the petition without an opinion. Ex parte Waddell Reed Fin., Inc. (No. 1001312, June 13, 2001).
On February 5, 2002, shortly before the trial began, the trial court entered a partial summary judgment in favor of WR as to any claims made by UILIC for tortious interference with business relations as to "acts occurring before the cancellation of the [PUA] on April 30, 2001." The trial court denied WR's motion for a summary judgment as to all other claims made by UILIC.
By the time trial began on February 19, 2002, WR had replaced more than 7,000 UILIC policies, compared to an average of *Page 1152 
650 policies replaced each year for the four years preceding 2001. WR responds that the volume of replacement during the years WR and UILIC were subsidiaries of the same parent corporation is substantially lower than generally encountered in the marketplace. Nevertheless, UILIC says it thereby suffered a decline of $655 million in variable-annuity insurance policy assets.
The case proceeded to trial on UILIC's claims of tortious interference as to acts that occurred after April 30, 2001, breach of contract, conversion, and fraud; and on WR's counterclaims of fraud, breach of contract, and unjust enrichment. The trial lasted for a month and resulted in a general verdict in favor of UILIC and against all five defendants on UILIC's claims and a separate verdict in favor of UILIC and against the defendants on WR's counterclaims. The jury awarded $50 million in compensatory damages, but it awarded no punitive damages. On March 25, 2002, the trial court entered a judgment on the jury's verdicts and noted that each party's claim for a declaratory judgment awaited further orders of the court. WR filed a postjudgment motion renewing an earlier motion for a judgment as a matter of law ("JML") as to all claims, and also moving for a new trial. The trial court entered an order denying WR's postjudgment motion; entering a declaratory judgment in favor of UILIC, holding that "there is no valid and binding contractual or other obligation requiring [UILIC] to pay the 20 basis points or 25 basis points compensation referenced in the July 8, 1999 letter"; and denying UILIC's request for an injunction prohibiting WR from replacing UILIC variable-annuity insurance policies. WR then appealed.
 II. Standard of Review
When reviewing a ruling on a motion for a JML, this Court uses the same standard the trial court used initially in deciding whether to grant or deny the motion for a JML. Palm Harbor Homes, Inc. v. Crawford, 689 So.2d 3
(Ala. 1997). Regarding questions of fact, the ultimate question is whether the nonmovant has presented sufficient evidence to allow the case to be submitted to the jury for a factual resolution. Carter v.Henderson, 598 So.2d 1350 (Ala. 1992). The nonmovant must have presented substantial evidence in order to withstand a motion for a JML. See §12-21-12, Ala. Code 1975; West v. Founders Life Assurance Co. ofFlorida, 547 So.2d 870, 871 (Ala. 1989). A reviewing court must determine whether the party who bears the burden of proof has produced substantial evidence creating a factual dispute requiring resolution by the jury.Carter, 598 So.2d at 1353. In reviewing a ruling on a motion for a JML, this Court views the evidence in the light most favorable to the nonmovant and entertains such reasonable inferences as the jury would have been free to draw. Id. Regarding a question of law, however, this Court indulges no presumption of correctness as to the trial court's ruling. Ricwil, Inc. v. S.L. Pappas Co., 599 So.2d 1126 (Ala. 1992).
 III. Tortious-Interference-with-Business-Relations Claim
WR argues that UILIC cannot recover on its tortious-interference claim because, it says, UILIC did not prove that WR was a stranger to the relationships with which WR allegedly interfered. Because UILIC failed to satisfy its burden of proof as to the "stranger" element, WR argues, the trial court erred in denying its motion for a JML as to the tortious-interference claim. UILIC argues that the trial court properly sent its tortious-interference claim to the jury because, it argues, it produced substantial evidence of (1) variable-annuity insurance policies with *Page 1153 
UILIC policyholders, (2) about which WR was aware, (3) with which WR intentionally interfered, (4) resulting in the migration and pirating of thousands of those policies and more than $655 million in lost revenue for UILIC. UILIC also argues that it produced substantial evidence indicating that WR was not a party to those policies and that it had no lawful control over them, and, therefore, that WR was a legal "stranger" to the policies.
In Parsons v. Aaron, [Ms. 1002086, October 4, 2002] 849 So.2d 932
(Ala. 2002), we discussed extensively the elements necessary to prove the tort of interference with contractual or business relationships:
 "This Court recently recognized that to establish tortious interference with contractual or business relations a plaintiff must prove:
 "'"1) the existence of a contract or business relation; 2) the defendant's knowledge of the contract or business relation; 3) intentional interference by the defendant with the contract or business relation; 4) the absence of justification for the defendant's interference; and 5) damage to the plaintiff as a result of the interference."'
 "Ex parte Awtrey Realty Co., 827 So.2d 104, 108-09
(Ala. 2001), quoting Soap Co. v. Ecolab, Inc., 646 So.2d 1366, 1371 (Ala. 1994).
 "Justification has been recognized both as an element to be proved by the plaintiff and as an affirmative defense to be pleaded and proved by the defendant. Compare Awtrey Realty, supra, and Pakruda v. Cross, 669 So.2d 907, 909 (Ala.Civ.App. 1995); BellSouth Mobility, Inc. v. Cellulink, Inc., 814 So.2d 203
(Ala. 2001). As we noted in BellSouth Mobility, '"it is illogical to continue to list an absence of justification as one of the elements of the plaintiff's cause of action and then to place the burden on the defendant to disprove it."' 814 So.2d at 212 n. 5, quoting Century 21 Academy Realty, Inc. v. Breland, 571 So.2d 296, 298 (Ala. 1990).
 "We agree with the language quoted in BellSouth Mobility. We reiterate that justification for interference with contractual or business relations is an affirmative defense to be pleaded and proved by the defendant.
 "In addition to the elements recited above, this Court has also recognized:
 "'"After proving the existence of a contract, it is essential to a claim of tortious interference with contractual relations that the plaintiff establish that the defendant is a `third party,' i.e., a `stranger' to the contract with which the defendant allegedly interfered." Atlanta Market Ctr. Management Co. v. McLane, 269 Ga. 604, 608, 503 S.E.2d 278, 282
(1998); see also Alcazar Amusement Co. v. Mudd Colley Amusement Co., 204 Ala. 509, 86 So. 209
(1920). This is so, because "a party to a contract cannot, as a matter of law, be liable for tortious interference with the contract." Lolley v. Howell, 504 So.2d 253, 255 (Ala. 1987).
 "'"One is not a stranger to the contract just because one is not a party to the contract. . . ." McLane, 269 Ga. at 608, 503 S.E.2d at 282 (emphasis added [in BellSouth Mobility]). As we recently stated in Colonial Bank v. Patterson, 788 So.2d 134 (Ala. 2000): "[W]hen tripartite relationships exist and disputes arise between two of the three parties, then a claim alleging interference by the third party that arises from conduct by the third party that is appropriate under its contract with the other two parties is not recognized."' *Page 1154 
"BellSouth Mobility, 814 So.2d at 212."
849 So.2d at 946-47.
Clearly, a party to a contract or a business relationship cannot be liable for tortious interference with that contract or business relationship. Colonial Bank v. Patterson, 788 So.2d 134, 137 (Ala. 2000); Ex parte Blue Cross Blue Shield, Inc., 773 So.2d 475, 480
(Ala. 2000). Parsons makes it clear that a plaintiff asserting a tortious-interference claim bears the burden of proving that the defendant is a "third party" or "stranger" to the contract or business relationship with which the defendant allegedly interfered. See alsoBellSouth Mobility, Inc. v. Cellulink, Inc., 814 So.2d 203, 212 (Ala. 2001). A defendant is a party in interest to a relationship if the defendant has any beneficial or economic interest in, or control over, that relationship. Parsons, 849 So.2d at 937; BellSouth, 814 So.2d at 214; Colonial Bank, 788 So.2d at 139; Blue Cross, 773 So.2d at 480.
In Parsons, we concluded that a father who participated in his son's decisions regarding the son's health-club business was not a stranger to the relationship between the health club and the plaintiff, who had been discharged from his employment with the health club. In BellSouth, we concluded that the plaintiff could not maintain a tortious-interference action in the context of a three-way relationship, where the parties were mutually dependent upon one another, because, in that context, the plaintiff could not establish, as a matter of law, that the defendant was a stranger to the relationship. We held that where a contract would not have been consummated without the participation of a certain party, that party is "anything but a stranger to the relationship." 814 So.2d at 214.
In reaching our decisions in Parsons and BellSouth, we relied upon Georgia law. See, e.g., Atlanta Market Ctr. Mgmt. Co. v. McLane,269 Ga. 604, 608, 503 S.E.2d 278, 282 (1998), which this Court embraced in Parsons and BellSouth. In Atlanta Market Center, the Supreme Court of Georgia stated:
 "After proving the existence of a contract, it is essential to a claim of tortious interference with contractual relations that the plaintiff establish that the defendant is a `third party,' i.e., a `stranger' to the contract with which the defendant allegedly interfered. One is not a stranger to the contract just because one is not a party to the contract, as it has been held that the alleged interferer is not a stranger to the contract and thus not liable for tortious interference where the alleged interferer was the agent for one of the parties to the contract of insurance (i.e., the underwriter), and all the purported acts of interference were done within the scope of the interferer's duties as agent. Jet Air v. National Union Fire Ins. Co., 189 Ga. App. 399, 375 S.E.2d 873 (1988)."
269 Ga. at 608, 503 S.E.2d at 282. The Court then concluded:
 "In Jefferson-Pilot Comm. Co. v. Phoenix City Broadcasting, 205 Ga. App. 57, 60, 421 S.E.2d 295
(1992), the shadow of liability for tortious interference was further diminished when the Court of Appeals reasoned that `all parties to a comprehensive interwoven set of contracts which provided for the financing, construction, and transfer of ownership' were not strangers, i.e., the purchaser of a radio station was not a stranger to the contractual relations between the radio station's seller and the seller's lenders. Thus, in order for a defendant to be liable for tortious interference with contractual relations, the defendant must be a stranger to both the contract and the *Page 1155 
business relationship giving rise to and underpinning the contract."
269 Ga. at 609, 503 S.E.2d at 283.
WR insists that it was not a stranger to the business relationships between UILIC and the policyholders, but was instead an integral part of those relationships. But for its efforts in selling and servicing the policies, it says, there would have been no relationship between UILIC and the policyholders. WR points out that UILIC depended upon WR's sales force to sell and service its policies, that the policyholders were customers of both UILIC and WR, and that the policyholders continued to be WR customers after they purchased UILIC's variable-annuity insurance policies.
Clearly, before UILIC terminated the PUA, WR was not a stranger to the relationships at issue here. The trial court so concluded when it entered the partial summary judgment in favor of WR as to the portion of UILIC's tortious-interference claim based on acts occurring before April 30, 2001 (the effective date of the termination of the PUA). The propriety of that ruling is not challenged by UILIC. WR maintains, however, that it continued to be a "non-stranger" to the relationships after the PUA was terminated. WR says that it continues to have a vested financial interest in the policyholders' variable-annuity investments and that it also continues to have obligations to service the UILIC variable-annuity insurance policies it has sold. Indeed, the agreement between WR and SAL acknowledges WR's authority and obligation to continue servicing those UILIC policies previously sold by WR and its right to continue to receive commission payments for those investments so long as those policies remain in force. The termination of the PUA, WR argues, did not suddenly transform WR into a stranger to the tripartite relationships between UILIC, the policyholders, and WR.
On the other hand, relying on Colonial Bank, UILIC argues that a party to a tripartite relationship is nevertheless a stranger to that relationship where its conduct is not "appropriate under its contract with the other two parties." Colonial Bank, 788 So.2d at 138. WR's mass replacement of UILIC's policies was not appropriate conduct, UILIC insists; therefore, WR must be considered a stranger to the relationships. In Colonial Bank, however, where we concluded that the bank was acting within its contractual rights in refusing to honor a counter check presented by the plaintiff, this Court meant by "appropriate" conduct conduct a party has the legal right to take even if the plaintiff objects to the conduct. 788 So.2d at 139. The evidence before us indicates that WR had the legal right to replace any UILIC policy if the circumstances were appropriate for the policyholder whose policy was replaced. Therefore, UILIC's reliance upon Colonial Bank is misplaced.
UILIC also argues that this Court has applied the "stranger" doctrine to immunize from liability only those non-parties to contracts who had effective control over performance of the contracts at issue. Thus, UILIC contends, the defendant in Parsons was not a "stranger" to the contract where he routinely acted as the agent of one of the contracting parties and where his conduct was ratified by that party; likewise, the defendant in BellSouth was not liable for tortious interference where its permission was required before the plaintiff could enter into the contractual relationship and where the contract itself defined certain rights and obligations of the defendant. 814 So.2d at 214. UILIC also cites Colonial Bank, 788 So.2d at 138 (the defendant was not a stranger to the *Page 1156 
contract between the plaintiff and a third party where the defendant's action was authorized by its own contract with the plaintiff and the third party); and Bama Budweiser of Montgomery, Inc. v.Anheuser-Busch, Inc., 611 So.2d 238, 247 (Ala. 1992) (the defendant was not a stranger to the contract where contract performance required the defendant's approval). Although WR was involved in soliciting applications for UILIC's variable-annuity insurance policies, UILIC argues, WR did not have the legal and contractual entitlements to participate in the contractual relationship that the defendants inParsons, BellSouth, Colonial Bank, and Bama Budweiser had.
We decline to retreat from our earlier acceptance of precedent from Georgia. We continue to find cases applying Georgia law to be helpful. See Britt/Paulk Ins. Agency, Inc. v. Vandroff Ins. Agency, Inc.,952 F. Supp. 1575 (N.D.Ga. 1996), aff'd, 137 F.3d 1356 (11th Cir. 1998) (table). In that case, a plaintiff insurance agency had a contract with a second insurance agency to market insurance policies provided by a third-party insurance carrier. Relying upon Georgia law, the United States District Court for the Northern District of Georgia held that the plaintiff insurance agency could not recover against the insurance carrier for tortious interference with the plaintiff's relationships either with its insureds or with the second insurance agency because, as a matter of law, the carrier was not a stranger to those relationships. Even though the carrier was not a party to the contracts at issue, its role as the issuer of the policies made it an "inextricable part" of the relationship and therefore incapable of tortious interference. 952 F. Supp. at 1585. The court applied a four-part test used by Georgia courts for determining whether a defendant is a stranger to a contract:
 "[A] defendant is not a `stranger' to a contract or business relationship when: (1) the defendant is an essential entity to the purported injured relations; (2) the allegedly injured relations are inextricably a part of or dependent upon the defendant's contractual or business relations; (3) the defendant would benefit economically from the alleged injured relations; or (4) both the defendant and the plaintiff are parties to a comprehensive interwoven set of contracts or relations. Barnwell [v. Barnett Co.], 222 Ga. App. 694, 476 S.E.2d 1 [(1996)]; Renden[, Inc. v. Liberty Real Estate, Inc.], 213 Ga. App. 333, 444 S.E.2d 814 [(1994)]; Lake Tightsqueeze[, Inc. v. Chrysler First Fin. Servs. Corp.], 210 Ga. App. 178, 435 S.E.2d 486 [(1993)]; Jefferson-Pilot [Comm. Co. v. Phoenix City Broadcasting, Ltd. of Atlanta], 205 Ga. App. 57, 421 S.E.2d 295 [(1992)]."
952 F. Supp. at 1584. The district court then concluded:
 "The court finds that Britt/Paulk's relationship with Vandroff was an inextricable part of the predominant agency relationship between Northbrook and Vandroff. It is uncontroverted that Britt/Paulk was marketing Northbrook's products. Without Northbrook's insurance to market and sell, the purported contractual and business relations at issue between Vandroff and Britt/Paulk would not have existed. In this instance, Britt/Paulk's contractual and business relations with Vandroff were clearly dependent upon Vandroff's relationship with Northbrook. As Britt/Paulk representatives have conceded, the equipment dealers program, like other multi-tiered marketing structures, functioned as a series of dependent relationships. . . . Moreover, absent the existence of the general agency relationship between Vandroff and Northbrook and Northbrook's inland marine insurance *Page 1157 
products, Britt/Paulk would have had no insurance to market and sell to its sub-producers and insureds. Accordingly, the court holds, as a matter of law, that Northbrook was not a `stranger' to the relationships at issue."
952 F. Supp. at 1586.
We also find support in another Georgia decision, LaSonde v. ChaseMortgage Co., 259 Ga. App. 772, 577 S.E.2d 822 (2003), in which the Court of Appeals of Georgia stated:
 "In order to be liable for interference with a contract, a defendant must be a stranger to both the contract and the business relationship giving rise to and underpinning the contract. One is not a stranger to the contract just because he is not a party to the contract. A tortious interference claim requires, among other things, wrongful conduct by the defendant without privilege; `privilege' means legitimate economic interests of the defendant or a legitimate relationship of the defendant to the contract, so that he is not considered a stranger, interloper, or meddler. A person with a direct economic interest in the contract is not a stranger to the contract. Parties to an interwoven contractual arrangement are not liable for tortious interference with any of the contracts or business relationships.
 "It is clear that Chase Mortgage was not a stranger to the sales contract between LaSonde and McGregor. Chase Mortgage held the note and security deed to the property at issue. Indeed, Chase Mortgage was responsible for deciding whether to permit McGregor or LaSonde to assume the loan on the property. Chase Mortgage had a direct economic interest in the property which was the subject of the sales contract."
259 Ga. App. at 773-74, 577 S.E.2d at 824 (emphasis added; footnotes omitted).
For the sake of clarity, we adopt the term "participant" to describe an individual or entity who is not a party, but who is essential, to the allegedly injured relationship and who cannot be described as a stranger. One cannot be guilty of interference with a contract even if one is not a party to the contract so long as one is a participant in a business relationship arising from interwoven contractual arrangements that include the contract. In such an instance, the participant is not a stranger to the business relationship and the interwoven contractual arrangements define the participant's rights and duties with respect to the other individuals or entities in the relationship. If a participant has a legitimate economic interest in and a legitimate relationship to the contract, then the participant enjoys a privilege of becoming involved without being accused of interfering with the contract. We conclude that UILIC's argument — that one can be considered a stranger to the relationship if one does not effectively control performance under the contract — is too narrow.
The evidence presented in this case establishes that WR was never a stranger to the relationships at issue, either before the PUA was terminated on April 30, 2001, or after. Indeed, even after UILIC terminated the PUA and signed a new agreement with SAL, UILIC insisted that WR execute a limited selling agreement with SAL before paying commissions due WR on new investments made by policyholders in UILIC variable-annuity insurance policies after the PUA was terminated. In a letter dated May 2, 2001, McWhorter wrote the following to WR agents on behalf of UILIC:
 "A new Principal Underwriting Agreement with SAL Financial was signed April 25, 2001. SAL determined (and we agree) that NASD [National Association *Page 1158 
of Securities Dealers] rules require [WR] to sign a written selling agreement with SAL before SAL can pay [WR] your commissions on variable policies."
WR did not agree that regulations of the National Association of Securities Dealers required such a contract; nevertheless, it entered into what is entitled a "limited selling agreement" with SAL on May 16, 2001. That agreement states, in pertinent part:
 "WHEREAS, [WR] served as the principal underwriter of the Variable Contracts pursuant to a Principal Underwriting Agreement between [WR] and [UILIC], as amended (the `PUA'), until May 1, 2001, when [SAL] became the principal underwriter for Variable Contracts issued on or after May 1, 2001; and
 "WHEREAS, [WR] will remain the broker of record for Variable Contracts it sold prior to May 1, 2001, and is owed and will continue to be owed compensation from [UILIC] relating to its sales of Variable Contracts; and
". . . .
 "WHEREAS, in the interests of resolving their dispute, the parties hereto wish to enter into this agreement for the limited purpose of permitting [SAL] to pay to [WR] compensation due to [WR] from [UILIC] for the sale by [WR] of Variable Contracts that are considered by [SAL] to have occurred on or after May 1, 2001."
That agreement then authorized WR to continue to service existing UILIC policyholders and to receive the compensation it was owed from UILIC. The agreement provided that WR was not authorized to sell any new variable-annuity insurance policies issued by UILIC, "except to the extent additional investments in Variable Contracts sold by [WR] prior to May 1, 2001 are considered to constitute new sales." The agreement also stated that it should not "be construed or interpreted to create any third party beneficiaries."
Before UILIC gave notice on February 28, 2001, of the termination of the PUA effective April 30, 2001, almost a year after filing this action charging tortious interference, UILIC alleged that WR was plotting mass replacements of UILIC policies while the PUA was in effect, and it claimed damages for policy replacements that occurred before and after it terminated the PUA. UILIC contends that the termination of the PUA ushered in an era in which WR became a stranger to the policyholder relationships, if it had not been so before then. Before the termination of the PUA, WR had ongoing relationships with the UILIC policyholders. Effective May 1, 2001, however, pursuant to the agreement between UILIC and SAL, WR continued to deal with UILIC's policyholders. The agreement recited that WR "is owed and will continue to be owed compensation from [UILIC]."
The termination of the PUA did not usher in a new era in which WR was reduced to a stranger to the relationships. UILIC was convinced when it contracted with SAL that WR intended to engage in a systematic mass replacement of its policies. SAL then contracted with WR, shortly after UILIC's relationship with WR ended. UILIC's contract with SAL is not contained in the voluminous record in this case. We do not know whether it was then possible for either UILIC to enter into arrangements with SAL to protect itself from the activities thereafter occurring that are the basis for the claims in this action or for SAL to enter into arrangements with WR calculated to protect UILIC. We do know that WR's right to compensation survived *Page 1159 
termination of the PUA or at least is recited in the agreement between SAL and WR and is not otherwise contradicted. The contract between SAL and WR is included in the record, and nothing in it protects UILIC from activities UILIC then believed WR was undertaking and of which UILIC, according to the allegations of its complaint filed on May 3, 2000, had been aware for some time. To the contrary, the agreement between SAL and WR expressly negated the possibility that any other party, such as UILIC, would enjoy the status of a third-party beneficiary.
The PUA between UILIC and WR did not preclude either party from marketing the products of a competitor. Indeed, this lawsuit stems from the consequences of a provision in the PUA giving WR the express right to represent the interests of competitors of UILIC. Such a provision countenancing divided loyalties may have appeared innocuous to UILIC in 1990 because of Torchmark's corporate structure. The fact that circumstances changed when Torchmark made the decision to spin off WR does not justify expanding the "shadow of liability" for tortious interference. We conclude that WR remained a participant in the business relationships after April 30, 2001, arising from interwoven contractual arrangements that include the variable-annuity insurance policies made the basis of UILIC's claim of tortious interference. While WR was neither an insurer nor a policyholder, its status as a participant permitted its involvement in servicing and replacing the UILIC policies before and after April 30, 2001, without being subject to the charge of being a stranger, interloper, or meddler guilty of interference.
As a matter of law, WR was a participant in business relationships arising from interwoven contractual arrangements that included the contracts of insurance. WR was not a stranger to these business relationships. The interwoven contractual arrangements defined the participant's rights and duties with respect to the other individuals or entities in the relationship. WR's legitimate economic interest in and legitimate relationship with the insurance contracts allowed WR to be involved in the insurance contracts without being subject to a claim of tortious interference. Therefore, UILIC's tortious-interference claim as to acts occurring after April 30, 2001, should not have been submitted to the jury, and the trial court should have entered a JML as to that claim.
Because we conclude that WR was entitled to a JML as to the tortious-interference claim, we need not address WR's argument that the trial court's jury instruction concerning the "stranger" element was erroneous or its argument that UILIC, by offering evidence specific to only 7 of the over 7,000 policyholders whose policies were replaced, failed to adequately prove its damages as to the tortious-interference claim.
 IV. Fraud Claims
In its complaint, as finally amended, UILIC included claims against WR alleging fraudulent suppression, deceit, and misrepresentation. UILIC claims that WR made two fraudulent promises — (1) an oral promise during the July 7, 1999, telephone conversations to agree in the future to contractual restrictions on policy replacements, and (2) a written promise in Tucker's January 26, 2000, letter asking UILIC to accept its "good faith promise" not to engage in mass replacement of UILIC's policies. Although UILIC couches its claims in terms of misrepresentation and deceit, both of those claims involve a promise to engage in, or refrain from engaging in, future conduct, and *Page 1160 
more accurately allege promissory fraud. UILIC also claims that while WR was representing to UILIC that it had no intention of replacing UILIC's business, it suppressed from UILIC its plan to do just that.
We first address UILIC's promissory-fraud claims.
 "The elements of fraud are (1) a false representation (2) of a material existing fact (3) reasonably relied upon by the plaintiff (4) who suffered damage as a proximate consequence of the misrepresentation. To prevail on a promissory fraud claim such as that at issue here, that is, one based upon a promise to act or not to act in the future, two additional elements must be satisfied: (5) proof that at the time of the misrepresentation, the defendant had the intention not to perform the act promised, and (6) proof that the defendant had an intent to deceive."
Padgett v. Hughes, 535 So.2d 140, 142 (Ala. 1988).
An essential element of any fraud claim is that the plaintiff must have reasonably relied on the alleged misrepresentation. Seward v. Dickerson, [Ms. 1011359, September 20, 2002] 844 So.2d 1207 (Ala. 2002); ForemostIns. Co. v. Parham, 693 So.2d 409 (Ala. 1997). This Court explained reasonable reliance in Torres v. State Farm Fire Casualty Co.,438 So.2d 757, 759 (Ala. 1983):
 "If the circumstances are such that a reasonably prudent person who exercised ordinary care would have discovered the true facts, the plaintiffs should not recover. . . .
 "'If the purchaser blindly trusts, where he should not, and closes his eyes where ordinary diligence requires him to see, he is willingly deceived, and the maxim applies, "volunti non fit injuria."'"
(Quoting Munroe v. Pritchett, 16 Ala. 785, 789 (1849).)
WR argues that any reliance by UILIC upon the July 1999 telephone conversations was not reasonable because, it argues, the promise allegedly made was vague and unenforceable. Furthermore, WR argues, any reliance by UILIC on those conversations would have ended long before any alleged mass policy replacements occurred. WR says that by the end of January 2000, it had made it abundantly clear to UILIC that it would not agree to restrictions on replacement of policies and, therefore, UILIC could not have reasonably relied upon the alleged promise after that. As to UILIC's reliance upon the January 2000 letter, WR points out that UILIC rejected its "good faith promise" in a letter that made it clear that UILIC was continuing to insist on contractual restrictions against the mass replacement of policies. If UILIC relied on that promise, WR says, it could have done so for only a very short time.
Our review of the complaint filed by UILIC makes it clear that any initial reliance by UILIC upon the two alleged fraudulent promises, however arguably reasonable at the time, ceased to be reasonable by February 22, 2000. In the initial complaint filed on May 3, 2000, UILIC states:
 "29. On February 22, 2000, WR terminated all further discussions on the inchoate agreements. WR further asserted that the July 8, 1999 letter constituted a contract in and of itself and not merely a letter of intent. WR claimed entitlement to begin withholding the additional basis points compensation from monies due to [UILIC]. Finally, WR rejected any recognition of any restrictions on the replacement of the existing [UILIC] business.
". . . . *Page 1161 
 "33. . . . [D]ue to the threats previously made by WR, [UILIC] reasonably believes that the WR Defendants through their registered sales representatives/licensed agents have attempted and will attempt to rewrite and replace inappropriately the existing block of business despite the wrongful and illegal nature of such a course of action."
(Emphasis added.) Certainly, by the time significant numbers of policy replacements began to occur in early 2001, UILIC could no longer have reasonably relied upon the alleged promises. Without the essential element of reasonable reliance, UILIC's promissory-fraud claims should not have been submitted to the jury, and the trial court should have entered a JML in favor of WR as to those claims.
We now turn to UILIC's fraudulent-suppression claim.
 "To establish a claim of fraudulent suppression, a plaintiff must produce substantial evidence establishing the following elements: (1) that the defendant had a duty to disclose an existing material fact; (2) that the defendant suppressed that existing material fact; (3) that the defendant had actual knowledge of the fact; (4) that the defendant's suppression of the fact induced the plaintiff to act or to refrain from acting; and (5) that the plaintiff suffered actual damage as a proximate result."
State Farm Fire Cas. Co. v. Slade, 747 So.2d 293, 323-24 (Ala. 1999).
UILIC contends that while WR was representing to UILIC that it had no intention of replacing UILIC's business, it was actively concealing its plan to do just that. UILIC says that WR's suppression of those facts lulled it into inaction, resulting in the loss of hundreds of millions of dollars in annuity business and in the loss of $385,933 in costs spent developing a new variable-annuity insurance policy that WR never intended to promote.
As to the loss of annuity business, UILIC knew by May 2000, as it stated in its complaint, that WR agents "have attempted and will attempt to rewrite and replace inappropriately the existing block of business." Armed with that knowledge, it is apparent that at least after May 3, 2000, WR's suppression of its true intentions did not induce UILIC to act or to refrain from acting to protect itself against what it then knew to be WR's intent. Because UILIC did not prove an essential element of fraudulent suppression as to the loss of annuity business — that WR's suppression of its true plan either induced UILIC to act or to refrain from acting — that portion of UILIC's fraudulent-suppression claim also should not have been submitted to the jury, and the trial court should have entered a JML in favor of WR as to that portion of the fraudulent-suppression claim.
As to UILIC's claim that WR's fraudulent suppression of its true intent caused it to spend $385,933 in developing a variable-annuity insurance policy, the Advantage Gold, that WR had requested but that it did not intend to actively promote, the record reflects that UILIC produced substantial evidence creating a factual dispute as to that portion of its fraudulent-suppression claim requiring resolution by the jury. The Advantage Gold policy was apparently developed during the fall of 1999 while contract negotiations were still ongoing between UILIC and WR. UILIC filed a prospectus concerning the Advantage Gold policy with the Securities and Exchange Commission in February 2000, and another in May 2000. McWhorter testified that the Advantage Gold policy cannot be sold by any company other than WR because *Page 1162 
WR mutual funds are tied into the policy. As to this portion of UILIC's fraudulent-suppression claim, the jury could have determined that WR's suppression of the fact that it planned a mass replacement of UILIC policies induced UILIC to act and that UILIC suffered actual damage as a proximate result. Therefore, that portion of UILIC's fraudulent-suppression claim seeking damages arising from costs of developing the Advantage Gold policy, which WR requested but did not intend to actively promote, was properly submitted to the jury, and the trial court properly denied WR's motion for a JML as to that portion of the fraudulent-suppression claim.
Because we hold that WR was entitled to a JML as to UILIC's promissory-fraud claims and its fraudulent-suppression claim concerning the loss of annuity business, we need not address WR's argument that UILIC did not present sufficient evidence of damages attributable to those fraud claims.
 V. Conversion Claim
WR next argues that the trial court should not have submitted UILIC's conversion claim to the jury. UILIC alleged that WR wrongfully withheld amounts owed to UILIC by its policyholders, thereby converting earmarked funds to its own use. WR argues that the conversion claim fails because, it says, it was lawfully entitled to the money and because the conversion claim seeks the recovery of moneys.
When WR customers purchased UILIC variable-annuity insurance policies, UILIC placed the premiums into its bank account. It then sent that amount of money to Target Funds, whose investment manager, a WR entity, invested the money in mutual funds. Each month, Target Funds redeemed enough mutual-fund shares to cover the ME charges owed to UILIC and wire-transferred that amount to a UILIC bank account. UILIC then paid WR from the ME charges. In January 2000, at the direction of WR, Target Funds began subtracting from the ME charges due UILIC an amount sufficient to pay WR the new commission amounts pursuant to the July 1999 letter. Target Funds then transferred the reduced amount of ME charges to UILIC and the commissions directly to WR.
WR argues that there is no conversion when a taking is contractually authorized, relying on Windsor v. General Motors AcceptanceCorp., 295 Ala. 80, 323 So.2d 350 (1975). WR maintains that the express terms of the July 1999 letter authorized the withholding of the disputed asset-based commissions, and that, if the terms of the letter are enforceable, then WR is contractually entitled to those commissions. UILIC argues that a claim for conversion is proper where there is a wrongful taking, detention, interference, or an illegal use or misuse of property belonging to another person. Crown Life Ins. Co. v.Smith, 657 So.2d 821 (Ala. 1994).
WR insists that the July 1999 letter is an enforceable contract, focusing on the phrase in the letter stating that it "fully describes" the parties' agreement. The letter contains all of the terms necessary for a contract, WR argues, and is therefore enforceable. Ex partePalm Harbor Homes, Inc., 798 So.2d 656, 661 (Ala. 2001). UILIC maintains that WR had no contractual right to direct Target Funds to change the manner in which it paid the ME charges to UILIC by paying the commissions directly to WR. UILIC focuses on the phrase in the letter that states that it discusses "some details" about compensation and product features, evidence it says indicates that the letter *Page 1163 
was not a binding contract or even a "letter agreement."
We need not decide in the context of UILIC's conversion claim whether the July 1999 letter was a contract between the parties because, even if it were a contract to modify the terms of the compensation WR was to receive from UILIC, nothing in the letter addressed the manner in which WR was to receive that compensation. Specifically, nothing in the letter authorized WR, acting through its officers who were also managers of Target Funds, to direct Target Funds to intercept funds historically collected for the payment of sums due UILIC for ME charges, to deduct from those funds sums due WR for commissions, and to cause those sums to be paid to WR. In so doing, WR engaged in an unauthorized set-off not shown to be supported by the terms of the letter. Nor are we shown how the documents governing the activities of Target Funds would permit such a practice.
WR also argues that UILIC's conversion claim should fail because it is based on money that is not capable of identification. WR relies on Campbell v. Naman's Catering, Inc., 842 So.2d 654, 659 (Ala. 2002), for the proposition that generally an action will not lie for the conversion of money. To be the subject of conversion, WR says, money must be segregated and specifically identifiable, e.g., placed in an earmarked, special account. Willingham v. United Ins. Co. of America,628 So.2d 328, 333 (Ala. 1993). WR argues that the Target Funds account was a "clearinghouse account" from which Target Funds made payments to UILIC and WR and that there is no evidence indicating that either Target Funds' account with UMB or any moneys in the account were segregated and earmarked for UILIC. On the other hand, UILIC argues that money is susceptible to conversion if it is capable of identification or if it comes from an identifiable source, citing Lewisv. Fowler, 479 So.2d 725, 726 (Ala. 1985). UILIC says that the payments due it were derived from a specifically identifiable source. Money is capable of identification and conversion, UILIC insists, if it can be "`described with such reasonable certainty that the jury may know what money is meant.'" Limbaugh v. Merrill Lynch, Pierce, Fenner Smith,Inc., 732 F.2d 859, 862 (11th Cir. 1984) (quoting Russell v. ThePraetorians, Inc., 248 Ala. 576, 580, 28 So.2d 786, 789 (1947)).
In Campbell, we discussed the requirement that one must be entitled to "specific money capable of identification" when one asserts a claim of conversion of money:
 "'Generally, an action will not lie for the conversion of money. However, if the money is capable of identification, then a claim of conversion may be appropriate. In Lewis v. Fowler, 479 So.2d 725, 725
(Ala. 1985), this Court discussed at length the circumstances under which an action for conversion will lie to recover a sum of money.
 "'"'"[T]rover lies for the conversion of `earmarked' money or specific money capable of identification, e.g., money in a bag or coins or notes which have been entrusted to defendants' care."' Hunnicutt v. Higginbotham, 138 Ala. 472, at 475, 35 So. 469, at 470 (1903) (quoting from 21 Enc. Pl. Prac., 1020, 1021). . . .
 "'"Money in any form is generally regarded and treated as property, and it is well settled that an action will lie for the conversion thereof, where there is an obligation to keep intact and deliver the specific money in *Page 1164 
question, and where such money can be identified. . . .
 "'"The requirement that there be `earmarked money or specific money capable of identification' before there can be a conversion has been complicated as a result of the evolution of our economic system.
 "'"Now, in conversion cases, the courts are not confronted so much with a particular piece of money, i.e., a coin or a bill, but with identified or segregated sources from which money has come or types of accounts into which money has been deposited.
 "'"Money paid by an insurance company to a hospital which had been assigned to the hospital by the plaintiff has been determined as a matter of law not to be specific property which would support an action for conversion. Humana of Alabama, Inc. v. Rice, [ 380 So.2d 862 (Ala.Civ.App. 1979)]. Shares in a `Ready Assets Trust Account' which must be redeemed for cash and on which checks can be written have been held to be sufficiently identifiable to support an action for conversion. Limbaugh v. Merrill Lynch, Pierce, Fenner Smith, Inc., 732 F.2d 859 (11th Cir. 1984) (citing Alabama law)."'"
842 So.2d at 659-60 (quoting Greene County Bd. of Educ. v. Bailey,586 So.2d 893, 898 (Ala. 1991)).
In Campbell, we concluded that the money at issue there, money deducted from an employee's paycheck, ostensibly for a Christmas Club account, was not held in any sort of special account. Here, however, the evidence indicated that there was a separate Target Funds account designated for UILIC's policyholders from which the ME charges were paid. While WR describes the fund as a "clearinghouse account" from which deductions for payments to both UILIC and WR were appropriate, as previously noted WR has not identified any provision in the documents governing the operation of Target Funds that supports the propriety of Target Funds' deduction of commissions due WR from the sums set aside to pay UILIC's ME charges. We conclude that those funds were sufficiently segregated and identifiable such that the jury could have determined that WR had converted them. Therefore, UILIC's conversion claim was properly submitted to the jury, and the trial court properly denied WR's motion for a JML as to that claim.
 VI. Breach-of-Contract Claim
In its complaint as finally amended, UILIC alleged that WR breached its contract with UILIC through diversion of funds and by failing to use its best efforts to perform the contract. Only one of those claims, breach of contract through diversion of funds, was submitted to the jury. This claim is based on the same diversion of funds that underlies UILIC's conversion claim. UILIC contends that WR breached Section 1(d) of the PUA by improperly directing Target Funds to forward directly to WR the compensation reflected in the July 1999 letter.
Section 1(d) of the PUA provides:
 "All purchase payments made or other monies payable under the policies shall be paid or remitted by or on behalf of policy owners directly to [UILIC] or its designated servicing agent and shall become the exclusive property of [UILIC]. [UILIC] will retain all such payments and monies except to the extent such payments and monies are allocated to the variable accounts."
WR argues that this section of the PUA does not apply to the funds at issue and thus was not breached. Section 1(d), WR *Page 1165 
says, encompasses only payments paid by or on behalf of policyholders, and the ME charges do not fall into that category.
WR also argues that even if Section 1(d) of the PUA applies to the ME charges, WR did not breach the contract because, it says, the commissions deducted from UILIC's Target Funds account and forwarded to WR were authorized by the July 1999 letter. We have previously rejected WR's right to rely on the letter as authority for the disputed payments.
UILIC argues that the PUA required WR to remit to UILIC all "purchase payments made or other monies payable" under the terms of the variable-annuity insurance policies. Because each policy called for a certain amount of ME charges, UILIC says, the ME charges were plainly contemplated by Section 1(d) of the PUA. Furthermore, UILIC argues, even if Section 1(d) was ambiguous, it was for the jury to decide whether that provision applied to ME charges. We agree that an ambiguity is presented as to the scope of Section 1(d).
In Employees' Benefit Ass'n v. Grissett, 732 So.2d 968 (Ala. 1998), we stated that in order to establish that a breach of contract has occurred, a plaintiff must prove: "'(1) the existence of a valid contract binding the parties in the action, (2) his own performance under the contract, (3) the defendant's nonperformance, and (4) damages.'" 732 So.2d at 975 (quoting Southern Med. Health Sys., Inc. v. Vaughn,669 So.2d 98, 99 (Ala. 1995) (citations omitted)).
As to the first element, it is clear that a valid contract existed. As to the second and third elements, when the trial court determines as a question of law that the terms of a contract are ambiguous in any way, the meaning of the contract presents a question of fact for the jury to resolve. McDonald v. U.S. Die Casting Dev. Co., 585 So.2d 853
(Ala. 1991). The existence of ambiguity justified submission to the jury of the issue whether the parties had performed their contractual obligations. As to the fourth element (damages), UILIC claims that WR improperly paid directly to itself over $10,000,000 from Target Funds. Therefore, UILIC's breach-of-contract claim was properly submitted to the jury, and the trial court properly denied WR's motion for a JML as to that claim.
WR also argues that the trial court erred when it refused to instruct the jury that UILIC had withdrawn its claim for breach of the "best efforts" clause of the PUA. Because we are remanding this case for a new trial as to some of UILIC's claims, which will not include the abandoned claim arising from the alleged breach of the "best efforts" clause, it is not necessary to address that argument.
 VII. General Verdict
The jury returned a general verdict in this case on UILIC's claims against WR. Because the tortious-interference claim, the promissory-fraud claims, and the fraudulent-suppression claim concerning the loss of annuity business were improperly submitted to the jury, we have in this appeal a "good count-bad count" situation analogous to that in Aspinwall v. Gowens, 405 So.2d 134 (Ala. 1981). See also Life Ins.Co. of Georgia v. Smith, 719 So.2d 797 (Ala. 1998). Here, WR submitted motions for a JML specifically directed to the various claims; those motions were denied. We cannot assume that the verdict was based only on those of UILIC's claims that were properly submitted to the jury. Accordingly, the judgment based on the jury verdict for UILIC must be reversed; we remand this case for a new trial on UILIC's claims of conversion, breach of contract, and fraudulent *Page 1166 
suppression as to the development of the Advantage Gold policy.
 VIII. WR's Counterclaims and the Declaratory Judgment
On rehearing, UILIC asks us to affirm the judgment in its favor on WR's counterclaims and to affirm the declaratory judgment in its favor concerning the July 1999 letter.[4] Both are due to be affirmed.
As previously noted, the jury returned a separate verdict in favor of UILIC on WR's counterclaims against UILIC for money damages; that verdict was distinct from the general verdict it returned in favor of UILIC on its claims for money damages against WR, and the trial court entered a judgment based on the two verdicts.
WR's counterclaims for damages were grounded upon its argument that the July 1999 letter was an enforceable contract. In its postjudgment motion, WR asked the trial court for relief from the judgment entered against it on its counterclaims. The trial court denied the motion.
WR also sought in its counterclaim a declaratory judgment. UILIC's complaint sought a declaratory judgment as well. Each claim for declaratory relief related to whether the July 1999 letter was an enforceable contract. The parties agreed to defer this issue until after the trial was completed. Indeed, according to paragraph 4 of the trial court's order set forth below, the parties discussed a procedure whereby the jury verdict on WR's counterclaims would guide the trial court's resolution of the competing requests for a declaratory judgment. The trial court resolved the parties' competing requests for a declaratory judgment in favor of UILIC, entering a judgment declaring that the July 1999 letter was not a binding contract. The trial court's judgment stated, in pertinent part:
 "1. The jury in the above-styled case heard testimony for several weeks before it rendered its verdicts in favor of [UILIC].
 "2. The verdict form on [WR's] counterclaims submitted to the jury contained boxes for the jury to check to indicate whether it found for [WR] on any or all three of the theories on its counterclaims. The jury returned a verdict in favor of [UILIC] on [WR's] counterclaims and did not check any of the boxes in favor of [WR], which was a specific rejection of [WR's] claim that the July 8, 1999 letter signed by the parties constituted a binding contract.
 "3. The jury returned a verdict in favor of [UILIC] for $50,000,000.00 in compensatory damages and awarded no punitive damages.
 "4. Prior to closing arguments, the parties and the Court discussed withholding the declaratory judgment claims from the jury and the Court deciding those claims in accordance with the jury's verdict, and that procedure was adopted and followed.[5]
 "5. Clearly the jury found [UILIC's] case that there was no binding contractual or other obligation to pay basis points compensation to be the more persuasive case and the Court finds no *Page 1167 error in this finding and corresponding verdict.
 "6. The Court finds that the totality of the evidence presented supports the jury's verdict. The Court further finds that insofar as the testimony of Anthony McWhorter and the testimony of Robert Hechler was in conflict, the jury was entitled to consider the testimony and demeanor of the witnesses and make credibility determinations.
 "7. The Court further finds and concludes from the totality of the evidence that [UILIC] has no past, present or future obligation to pay either the 20 basis points or 25 basis points compensation referenced in the July 8, 1999 letter."
(Emphasis added.)
On rehearing, WR argues for the first time that its counterclaims for money damages are "inextricably intertwined" with its request for declaratory relief, and that both the trial court's judgment on the counterclaims and its declaratory judgment should be reversed and the case remanded for a new trial.[6] Even if we were to accept that argument, in order to overturn the trial court's declaratory judgment we would have to reverse it on the ground that the trial court erred in embracing the jury verdict on the counterclaims as to the issue of the existence of a contract. Although in its motion for new trial WR attacked the judgment based on the jury verdict on the counterclaims, WR does not refer to the reversal of that judgment in its initial brief in this Court. In that brief, WR first presented its argument concerning the validity of the July 1999 letter in the context of the availability of a defense to UILIC's conversion claim. Then, in arguing that this Court should reverse the declaratory judgment entered in favor of UILIC, WR argued only that the July 1999 letter was a valid contract for the reasons stated in its argument concerning the conversion claim and that, therefore, the trial court erred by not entering a declaratory judgment in its favor. Because it never asked this Court to reverse the underlying judgment on its counterclaims for money damages upon which the trial court's declaratory judgment is based, WR is precluded from seeking a reversal of the declaratory judgment that, according to paragraph 4 of the trial court's order, was based on the judgment entered on the jury verdict on the counterclaims. Issues not argued in a party's brief are waived. Bogle v. Scheer, 512 So.2d 1336
(Ala. 1987).
We therefore affirm the judgment entered on WR's counterclaims and the declaratory judgment.
 IX. Conclusion
We affirm the judgment in favor of UILIC as to WR's counterclaims *Page 1168 
against it and the declaratory judgment in favor of UILIC as to the July 1999 letter. We reverse the judgment in favor of UILIC on its claims alleging tortious interference, promissory fraud, and fraudulent suppression as to the loss of annuity business, and we render a judgment in favor of WR on those claims. We also reverse the judgment in favor of UILIC on its claims alleging conversion, breach of contract, and fraudulent suppression as to the development of the Advantage Gold policy, and we remand the case for a new trial on those claims.
APPLICATION GRANTED; OPINION OF APRIL 18, 2003, WITHDRAWN; OPINION SUBSTITUTED; AFFIRMED IN PART; REVERSED IN PART; JUDGMENT RENDERED IN PART; AND REMANDED.
MOORE, C.J., and HOUSTON, BROWN, JOHNSTONE, HARWOOD, WOODALL, and STUART, JJ., concur.
[1] UILIC remained a subsidiary of Torchmark.
[2] UILIC paid asset-based commissions to WR for selling and servicing UILIC's variable-annuity insurance policies. Asset-based commissions are calculated on an annual percentage of the assets resulting from investment of the annual premiums. Charges and fees on variable-annuity insurance policies are referred to as "basis points." One basis point equals 1/100 of 1% of the asset value; 100 basis points equals 1% of the asset value.
[3] WR also named as counterclaim defendants Torchmark and Ronald K. Richey, a former chairman of Torchmark's board of directors. The trial court entered summary judgments in favor of both Torchmark and Richey and certified those judgments as final pursuant to Rule 54(b), Ala.R.Civ.P. This Court affirmed those judgments, without opinion. Waddell ReedFin., Inc. v. Richey (No. 1011179, October 25, 2002), ___ So.2d ___ (Ala. 2002) (table).
[4] UILIC makes no argument on rehearing as to our reversal of the judgment in its favor on its claims against WR alleging tortious interference, promissory fraud, and fraudulent suppression as to the loss of annuity business.
[5] The parties, in their principal briefs, have not challenged the propriety of this course of action.
[6] WR also argued in its brief in opposition to rehearing that "the Court expressly held that it was intentionally `not decid[ing] whether the July 1999 letter was a contract between the parties,' thus leaving that issue — which was at the heart of each of WR's counterclaims — open for retrial." WR's rehearing brief at 2 (quoting the original opinion in this case; alteration in WR's brief on rehearing). WR then argues that "the Court's decision not to resolve the issue of the validity of the letter agreement demonstrates that the Court determined that it should not affirm the declaratory relief in favor of UILIC." WR's brief on rehearing at 4. That argument is a stretch. In our discussion of UILIC's conversion claim in our original opinion, we stated: "We need not decide whether the July 1999 letter was a contract between the parties because, even if it were a contract to modify the terms of the compensation WR was to receive from UILIC, nothing in the letter addressed the manner in which WR was to receive that compensation." (Emphasis added.) We have today modified that statement to indicate that we need not decide the issue inthe context of UILIC's conversion claim.