R. D. Patterson sued Colonial Bank ("Colonial"), alleging negligence, breach of contract, conspiracy, wrongful dishonor of a check, and intentional interference with business relations. In response, Colonial filed a counterclaim to collect a debt Patterson owed Colonial. Colonial moved for a summary judgment; the trial court granted its motion as to the claims alleging negligence, breach of contract, and wrongful dishonor. The case proceeded to trial on the claims alleging conspiracy and intentional interference with business relations. At the close of Patterson's case, Colonial moved for a judgment as a matter of law ("JML"). The trial court entered a JML in favor of Colonial on its counterclaim, but denied a JML as to the rest of the claims. Patterson's claim alleging intentional interference with business relations was submitted to the jury,[1] which returned a verdict in favor of Patterson, awarding him compensatory damages in the amount of $60,640, and punitive damages in the amount of $939,000. The trial court set off the amount of Colonial's counterclaim, $27,274.54, and entered a judgment based on the verdict. After it set off the amount of Colonial's counterclaim, the court entered a judgment for Patterson for $972,365.46. Colonial renewed its motion for a JML and moved, in the alternative, for a new trial or a remittitur of the damages award. The trial court denied the JML, but ordered a remittitur of the punitive-damages award in the amount of $575,160, thereby reducing the punitive-damages award to $363,840. The plaintiff accepted the remittitur.
Colonial appealed. It argues: (1) that the trial court erred by not entering a JML on Patterson's claim alleging intentional interference with business relations; (2) that the trial court erred in submitting Patterson's punitive-damages claim to the jury; and (3) that the trial court erred by not ordering a total, or substantially greater, remittitur of the punitive-damages award. Patterson cross-appealed from the trial court's order of remittitur, contending the remittitur is not supported by the law or facts of the case. (See Rule 59(f), Ala.R.Civ.P.) We reverse the judgment for Patterson, because the trial court erred in denying Colonial's motion for a JML, and *Page 136 
we render a judgment for Colonial; we dismiss the cross-appeal as moot.
Patterson and Steve Nordness were equal owners and the only members of the board of directors of Resource 100 Management Group, Inc. ("Resource 100"), an employee-leasing agency. Nordness was the president of the corporation, and Patterson was the secretary and treasurer. Resource 100 presented its certificate of incorporation to Colonial and opened a business account. Originally, Nordness was the sole signatory on the account, but later Patterson was added. Nordness and Patterson began having strained business relations. Nordness informed Patterson that Resource 100 was in a bad financial condition and could no longer pay either of them a salary. Patterson thereupon began paying his own salary, from the Resource 100 account, using counter checks. Nordness discovered by conversation with Randy Watts, who handled Resource 100's books, that counter checks were being written on the account. Nordness asked Colonial to find out who the payee was on these counter checks, and Colonial informed him that it was Patterson.
Nordness asked Steve Blake, a Colonial representative, how he could have Patterson's name removed from the account. Blake advised him that he had several options — that he could: (1) take the money out of the account and open a new account; (2) take the money out of the account and deposit it in another bank; or (3) present Colonial with a corporate resolution removing Patterson's name from the account. Nordness chose this third alternative. He returned to the bank with two documents: one purporting to dismiss Patterson from the company, and another representing that a resolution by the board of directors had removed Patterson as a signatory on the account. The resolution was signed by Nordness as president and as secretary of Resource 100.
Colonial responded by authorizing a stop order on all counter checks. In early 1997, Patterson presented to the bank a counter check payable to himself. Colonial refused to honor the counter check and informed Patterson that his name had been taken off the account. Patterson then contacted Blake, who explained that the documents received by Colonial indicated that Patterson had been removed from Resource 100's board of directors and had been removed as a signatory on the account. Patterson told Blake that these documents were erroneous and that he had never been informed of a board-of-directors meeting and had not consented to the action purportedly taken by the board.
Patterson claims that Colonial was involved in helping Nordness "shove" Patterson out of Resource 100. He argues that Colonial and Nordness engaged in discussions concerning Nordness's possibly "buying" Patterson out of the business. Patterson claims that Blake created a plan that would give Nordness control of the company and would aid Colonial in recovering its money on several unpaid loans it had made to Patterson. Patterson claims that Blake suggested that Colonial lend Nordness the money to purchase Patterson's interest in Resource 100 and that the loan transaction be conducted in such a way that at closing a check could be written by Nordness directly to Colonial covering Patterson's indebtedness. Nordness eventually did approach Patterson and offer to buy Patterson's interest in the corporation or to sell Patterson Nordness's own interest. Patterson refused Nordness's initial offer, but eventually he sold his stock in the company to Nordness for less than Nordness's original offer.
Colonial argues that the trial court erred in denying its JML motion *Page 137 
because, it argues, Patterson did not present substantial evidence as to all of the elements of his claim alleging intentional interference with a business relationship. To defeat a JML motion directed to such a claim, a plaintiff must present substantial evidence of the following elements: (1) the existence of a contract or business relation; (2) the defendant's knowledge of the contract or business relation; (3) intentional interference by the defendant with the contract or business relation; (4) the absence of justification for the defendant's interference; and (5) damage to the plaintiff resulting from the interference. Soap Co. v.Ecolab, Inc., 646 So.2d 1366, 1370-71 (Ala. 1994).
The tort of intentional interference with business relations was recognized so as to provide a remedy in the situation where a third party intentionally interferes with the relationship of two contracting parties. Cahaba Seafood, Inc. v. Central Bank of the South, 567 So.2d 1304,1306 (Ala. 1990). Moreover, a party to a particular contract cannot, as a matter of law, be liable for tortious interference with that contract.Bama Budweiser of Montgomery, Inc. v. Anheuser-Busch, Inc., 611 So.2d 238,247 (Ala. 1992).
In Bama Budweiser, the owner of Bama Budweiser, Schilleci, sued Anheuser-Busch, alleging the tort of intentional interference with business relations. Anheuser-Busch had assigned different areas of primary responsibility to its wholesalers. Schilleci approached one of Anheuser-Busch's wholesalers, Daniel, about purchasing two of the wholesale beer distributorships in Alabama. The two came to an agreement regarding the sale, an agreement contingent upon Anheuser-Busch's approval of Schilleci as a wholesaler. Eventually, Schilleci was approved as a transferee of the wholesale beer distributorships. The parties signed an agreement, and Schilleci was given his territory. Soon after Schilleci began distributing in his assigned territory, he discovered that he was not the sole distributor in the area and that an informal agreement had been made between Daniel and Horn, another wholesale beer distributor, by which Horn would be allowed to distribute in that particular territory. Schilleci sent a letter to Anheuser-Busch, asking that it resolve the problem. Anheuser-Busch, however, recommended that Horn be allowed to continue distributing in that area. Schilleci argued that Anheuser-Busch had interfered with the contract between Schilleci and Daniel by allowing the holder of another of Anheuser-Busch's accounts to work in Schilleci's territory. This Court held that Anheuser-Busch was a party to the contract between Daniel and Schilleci because, without Anheuser-Busch's approval, neither Schilleci nor Daniel could market or sell Anheuser-Busch products. By accepting the assignment of Daniel's contract with Anheuser-Busch, Schilleci bound himself to the terms of that agreement.
In the present case, Patterson's claim alleging intentional interference with business relations revolves around the dishonor of a counter check that Patterson presented to Colonial on the Resource 100 account. This dishonor forms the basis of Patterson's argument. Patterson argues that Colonial dishonored the counter check, as a means to accomplish an interference with Patterson and Nordness's stockholder relationship and their negotiations over the sale of stock. He claims that by not releasing any funds from the Resource 100 account to Patterson, Colonial forced Patterson to sell his share of the business because, he says, without funds from that account he had no income, and the sale of his stock allowed Colonial to recover the unpaid balances on its loans to Patterson.
Early in the business relationship, and after the Resource 100 account had been *Page 138 
established, Patterson and Nordness entered into an agreement with Colonial by which each would be a signatory on the account. Each of them signed documents that related to the account and defined the rules governing the account. The signature-card contract, which both Patterson and Nordness also signed, incorporated Colonial's "Rules and Regulations for Depository Accounts."
These rules and regulations regarding "Business and Organization Account Authorized Representatives" provide:
 "You agree that each authorized representative shall have full authority, subject to the provisions of the signature card and supporting documents, for all actions relating to your account, including, but not limited to, checks, closing the account, stopping payment, assigning the account or overdrawing the account for both savings and checking accounts. . . .
 "If there is a dispute between the authorized representative(s) who has signed a signature card, or if one of the authorized representative(s) demands that we not allow other(s) to withdraw money from the account, or if there is a dispute about who is authorized to make withdrawals from an account, we may refuse to allow certain withdrawals by anyone until we are satisfied that the dispute is resolved or the demand is withdrawn. We will not be responsible for any damages you may suffer as a result of our refusal to allow you to withdraw money due to the dispute or demand. . . ."
(Emphasis added.)
Clearly, Colonial had the prerogative to choose not to honor Patterson's counter check.[2] It is evident in the rules, which both Nordness and Patterson signed, that Colonial reserved the right to withhold funds at the onset of any dispute between authorized representatives, such as Nordness and Patterson. Moreover, Nordness and Patterson agreed, when they signed the signature contract card, that any authorized representative would have full authority for all actions relating to the account. Thus, Nordness, by virtue of the contract between Resource 100 and Colonial, had the authority to inform Colonial to place a stop order on all counter checks; he exercised that authority and Colonial placed the stop order.
Colonial, acting under the authority of the contract signed by both Patterson and Nordness as signatories on the account, chose not to honor the counter check presented by Patterson. Patterson argues that the interference arose in regard to the separate relationship between Nordness and him, a relationship as to which, he says, Colonial was not a party. However, when tripartite relationships exist and disputes arise between two of the three parties, then a claim alleging interference by the third party that arises from conduct by the third party that is appropriate under its contract with the other two parties is not recognized. Bama Budweiser, 611 So.2d at 247; see, also, Ex parte BlueCross Blue Shield of Alabama, 773 So.2d 475 (Ala. 2000).
Patterson also contends that Colonial had the burden to show that its actions were taken without malice or with justification. First, his argument improperly *Page 139 
presupposes that he had a cause of action for interference, and, therefore, the relevance of the defense of justification.[3] Second, this argument would superimpose on a wrongful-interference claim a requirement of good faith that would compel a party to forgo any reliance on a legal right conferred by the agreement underlying the depositor relationship.
Colonial had the legal right to do exactly as it did, given the clear language of the Rules and Regulations for Depository Accounts and the undisputed evidence regarding a dispute between Patterson and Nordness. The conduct of Colonial that Patterson condemns is specifically allowed by the agreement, and Patterson, by characterizing that conduct as conduct taken in bad faith, cannot defeat Colonial's right to take that action. Government St. Lumber Co. v. AmSouth Bank, N.A., 553 So.2d 68,73 (Ala. 1989) ("`The obligation to act in good faith does not bar a party from enforcing whatever legal rights he possesses. In the name of good faith, a party cannot be required to [forgo] or surrender a right that he otherwise possesses.'" (quoting Rigby Corp. v. Boatmen's Bank Trust Co., 713 S.W.2d 517, 535 (Mo.App. 1986))).
For Patterson to succeed on his attempt to limit the scope of the rules and regulations so as to prevent them from applying to this transaction, we would have to alter some unambiguous language. The rules regarding restrictions on withdrawals begin with the phrase "In the event of any
controversy" (emphasis added), and while they contain an illustration concerning a dispute over who makes withdrawals, to confine the operation of the rules to such a circumstance would be to rewrite the agreement.[4]
The rules and regulations preclude our imposing on Colonial a liability for refusing to allow withdrawal of money. The dishonor of Patterson's check had precisely that effect — Patterson could no longer draw checks on the business account in order to pay his salary.
Because Patterson's claim alleging intentional interference with business relations is based on Colonial's dishonoring the counter check, and because Colonial, as a party to the business relationship with Patterson and Nordness, had the legal right to take that action, the trial court should have granted Colonial's motion for a JML on Patterson's claim alleging a wrongful interference with a business relationship. The judgment is reversed and a judgment is rendered for Colonial. The cross-appeal is dismissed as moot.
1990237 — REVERSED AND JUDGMENT RENDERED FOR COLONIAL BANK.
1990293 — DISMISSED AS MOOT.
HOOPER, C.J., and MADDOX, COOK, and JOHNSTONE, JJ., concur.
[1] The trial court did not charge the jury on the claim of conspiracy, and Patterson did not object to the court's failing to do so. Thus, the jury deliberated only on the claim of intentional interference with business relations. Because Patterson did not object to the jury charges, we do not address the merits of that claim.
[2] In fact, the trial court instructed the jury that Colonial had acted within its contractual rights, in accordance with the rules and regulations governing the checking account, in refusing to allow Patterson to withdraw money from the account while there was a dispute between Patterson and Nordness as to who was authorized to withdraw money from the account.
[3] Cases dealing with a malicious abuse of a lawful privilege are therefore not applicable here. See, e.g., Pegram v. Hebding,667 So.2d 696 (Ala. 1995).
[4] The pertinent portion of the section of the rules and regulations regarding "Withdrawals" provides:
 "In the event of any controversy between those of you who have signed a signature card for a joint account or the authorized representatives who have signed a signature card for a non-personal account, such as a dispute over who has the right to make withdrawals from the account or who is the owner of the funds on deposit in the account, we may (but do not have to) refuse to allow certain withdrawals until we are satisfied that the dispute is resolved or the demand is withdrawn. We will not be responsible for any damages you may suffer as a result of our refusal to allow you withdraw money due to the dispute or demand. . . ." *Page 140