[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 445 
Larry Duke d/b/a Duke's Vending ("Duke") sued Tom's Foods, Inc., alleging as its sole cause of action intentional interference with business or contractual relations.[1] The case proceeded to trial, and the jury awarded Duke $500,000 in compensatory damages and $4 million in punitive damages. Tom's Foods moved for a new trial. After a hearing, the trial court denied the motion conditioned on Duke's accepting a remittitur of the punitive damages to $750,000. Duke accepted the remittitur.
In case no. 1021095, Tom's Foods appeals. It challenges the trial court's denial of Tom's Foods' motions for a judgment as a matter of law; contests certain evidentiary rulings by the trial court; argues that the evidence of compensatory damages presented by Duke and relied upon by the jury was so flawed as to require a new trial; and argues that the punitive-damages award, even as remitted, is grossly excessive. In case no. 1021155, Duke appeals from the trial court's order of remittitur.
Because we conclude that the trial court erred in denying Tom's Foods' motion for a judgment as a matter of law, we reverse and remand with directions in case no. 1021095. Because of our resolution of case no. 1021095, we need not consider whether the trial court's order of remittitur was excessive, and we dismiss the appeal as moot in case no. 1021155.
 Background
Tom's Foods manufactures snack foods. Tom's Foods distributes its products through independent distributors and company-owned routes. *Page 446 
Frances Mims and her sons, Todd Mims and Ronnie Mims, own Dixie Snax, Inc. ("Dixie"), a vending-machine company. Tom's Foods and Dixie entered into a licensing agreement pursuant to which Dixie was authorized to use Tom's Foods trademark and logo. Tom's Foods and Dixie also entered into a distributorship agreement pursuant to which Dixie acted as an independent distributor for Tom's Foods products. As a distributor of Tom's Foods products, Dixie was required to service Tom's Foods' "national chain accounts" (accounts such as national grocery stores) and Tom's Foods' "over-the-counter businesses" ("mom and pop" stores). Dixie also serviced its own vending-account locations; Dixie obtained each of those accounts without assistance from Tom's Foods by obtaining permission to place one of Dixie's vending machines at the location. Dixie stocked all of its vending machines with products manufactured by Tom's Foods.
Dixie purchased and financed some of its vending machines through a division of Tom's Foods. In conjunction with financing those vending machines, Dixie executed certain promissory notes and security agreements to which Tom's Foods was a party. In addition to securing Dixie's debt regarding the vending machines it was purchasing, the security agreements were applicable to:
 "All obligations and indebtedness of every kind and nature which [Dixie] may owe Secured Party, whether existing now or subsequent to the execution of this instrument, including . . . renewals, modifications and extensions . . . and all further indebtedness and liability of any nature whatsoever. . . ."
Dixie used the vending machines purchased under the promissory notes as collateral. In addition, Dixie specifically pledged as collateral all of Dixie's other vending machines, office equipment, trucks, inventory, and cash proceeds. The security agreements provided that the holder of those agreements had a security interest in the following:
 "A. All vending machines, including but not limited to those manufactured by POLYVEND . . . now owned or hereinafter acquired by [Dixie], together with all additions, substitutions or replacements thereto including vending parts, coin changers and dollar bill validators. . . .
 "B. All inventory of merchandise, goods and other personal property now owned or hereafter acquired by [Dixie] which are held for sale in [Dixie's] business, and wherever the inventory, goods and personal property may be located, including without limitation, in [Dixie's] warehouse, vending machines or motor vehicles. It is understood between [Dixie] and Secured Party that [Dixie's] inventory of merchandise, goods and other personal property will change in specifics and the lien herein created on said inventory is a continuing lien on all personal property hereafter acquired by [Dixie] wherever located.
 "C. Continuing general lien and security interest in all cash, cash and non-cash proceeds and accounts receivable now or hereafter owned or acquired. . . ."
In the event Dixie defaulted, the security agreements also gave the secured party the right to repossess the collateral. The agreements also prohibited the transfer of any of Dixie's vending machines without the prior written consent of the secured party.
In 1990, Tom's Foods assigned its rights in the notes and security agreements to Stephens Diversified Leasing, Inc. The assignment of the notes and security interests provided for "recourse by [Stephens] against [Tom's Foods] in the event of default by [Dixie] under the Purchased Receivables." *Page 447 
This right of recourse required Tom's Foods to repurchase the commercial paper from Stephens in the event Dixie defaulted on any of the notes. Thus, Tom's Foods remained liable in the event of a default.[2]
In 1994 and 1995, Dixie leased additional vending machines from Stephens. Dixie and Stephens signed a master lease agreement ("the lease"), which allowed Dixie to lease additional machines from Stephens at different times. The lease stated, "Except as otherwise provided . . . such additional personal property shall be leased upon the terms and conditions herein contained."
The lease also provided that, upon Dixie's default under the lease, all unpaid debts would become due and Stephens was entitled to repossess the leased vending machines without legal process.[3] The lease also prohibited Dixie from transferring the machines without Stephens's prior written consent. The lease appointed Tom's Foods as Stephens's agent for the purpose of "auditing and enforcing [Dixie's] compliance with the terms of this lease. [Dixie] hereby acknowledges and consents to such appointment of Tom's Foods, Inc. as Lessor's limited agent, and agrees to cooperate with Tom's Foods, Inc. in the performance of [Dixie's] duties hereunder." Stephens later became known as "STI Credit Corporation."[4]
At the end of 1996, Dixie experienced severe financial problems and defaulted on its obligations to STI under the promissory notes and the lease. In multiple letters dated January 31, 1997, STI notified Dixie that it was in default under the promissory notes and under the terms of the lease and that STI was accelerating and demanding payment of the entire balance due under the notes and the lease from Dixie. STI advised Dixie that it had 10 days to cure the default or STI would begin repossessing the vending machines. Dixie did not cure the default.
Also in 1996, Dixie failed to make timely payments on merchandise accounts with Tom's Foods and defaulted in servicing Tom's Foods national chain accounts and over-the-counter businesses. As a result, on January 29, 1997, and on January 31, 1997, Tom's Foods terminated Dixie's licensing agreement and Dixie's distributorship agreement, respectively.
On February 18, 1997, STI requested, pursuant to the lease agreement, that Tom's Foods, as STI's agent, repossess the collateral securing the promissory notes and the lease. STI provided Tom's Foods *Page 448 
a list of the serial numbers of the vending machines to be repossessed but added that the "collateral is not limited to the above [listed vending machines] but includes all vending machines, including but not limited to those manufactured by Polyvend, Inc., Conway, Arkansas, now owned or hereafter acquired by [Dixie], together with all additions, substitutions or replacements, including vending parts, coin changers and dollar-bill validators."
Tom's Foods began its repossession efforts on February 19, 1997; those efforts continued into March. Tom's Foods either physically picked up the vending machines from their locations or repositioned them so they were inaccessible to the public or placed repossession stickers on them.[5] After terminating Dixie's distributorship agreement and while it was repossessing Dixie's vending machines, Tom's Foods set up a "Temporary Company Operation" ("TCO") in the Dothan area so that Tom's Foods could service its national chain accounts and over-the-counter businesses that had been abandoned by Dixie. Kirk Kuntz, division sales manager for Tom's Foods, was placed in charge of the TCO.[6]
Tom's Foods also wanted to expand its business in the Dothan area. Therefore, in addition to repossessing Dixie's vending machines and servicing its national chain accounts and over-the-counter businesses in the area, Tom's Foods employees began soliciting businesses, schools, and recreation centers regarding their vending accounts. Tom's Foods employees made many of these solicitations for new vending accounts when they located Dixie's vending machines in their repossession efforts. Thus, Tom's Foods began soliciting some of Dixie's vending accounts.[7]
 Larry Duke d/b/a Duke's Vending
Larry Duke, the sole proprietor of Duke's Vending, testified that, at the end of 1996 or early in 1997, he learned that Dixie was experiencing financial trouble.[8] In early 1997, Duke approached members of the Mims family and expressed interest in purchasing Dixie's accounts and the equipment used to service the accounts. The two began negotiating. According to Duke, they orally agreed to the purchase terms in February 1997.[9]
Because Duke had filed a petition in bankruptcy for protection under Chapter 13 that was pending during this time, he proposed to obtain financing from Carl Henry, a private investor located in Georgia with whom Duke had previously engaged in business. Duke testified that because Dixie's customers *Page 449 
were actively trying to locate a new supplier for their locations, he immediately began servicing Dixie's vending machines and filling those machines with Duke's products in order to avoid losing the accounts.
Todd Mims, one of the owners of Dixie, testified that, upon reaching an agreement with Duke, he drafted a letter to Dixie's vending-account customers informing them that Dixie had sold its vending machines to Duke and that Duke would service their vending accounts from that point forward. This letter was undated. However, it is clear that when Dixie sent this letter to its customers, no agreement regarding the purchase transaction had been executed and Dixie's debt to STI had not been paid. In fact, Duke had not yet obtained financing for the transaction.
Duke began servicing Dixie's vending accounts in mid-February, immediately after reaching the oral agreement with Dixie.[10] Duke testified that a few days later, Duke met with Kuntz, Tom's Foods division sales manager.[11]
According to Duke, Kuntz said he was aware that Duke was working the Dixie vending accounts and machines, that Tom's Foods was going to repossess Dixie's vending machines, and that Duke had no right to sell his products out of them. Duke asserts that he explained to Kuntz that he had negotiated a deal to purchase both Dixie's vending machines and Dixie's vending accounts.
Duke claimed that, at approximately the same time he began servicing Dixie's accounts, Tom's Foods began its repossession efforts. As noted, those efforts consisted of placing repossession notices on Dixie's vending machines, turning machines around so that they were inaccessible to customers, or physically removing machines from Dixie's account locations. Duke alleged that, because he had replaced some of Dixie's vending machines *Page 450 
with his own machines before Tom's Foods began its repossession efforts, Tom's Foods "repossessed" some of Duke's vending machines by turning them around or by placing repossession stickers on them. Duke also claimed that employees of Tom's Foods physically removed a few of his vending machines from their locations.[12] In his deposition, Duke testified that those actions appeared to be a mistake on Tom's Foods part. Later at trial, Duke claimed that his machines were easily distinguishable from Dixie's and, therefore, that Tom's Foods could not have repossessed Duke's machines by mistake. (Duke's brief at p. 10).
Additionally, Duke claimed that employees of Tom's Foods "crow-barred their way in" to some of Dixie's vending machines and to some of his own that he had placed at Dixie account locations; Duke claimed that when they did so the employees removed whatever product was inside the vending machine and replaced it with a Tom's Foods product.[13] Duke also alleged that employees of Tom's Foods removed any money they found in Dixie's vending machines.
Duke also complained that Tom's Foods employees began improperly soliciting Dixie's account holders; Duke alleges that, in some instances, Tom's Foods simply replaced Dixie's (or Duke's) vending machines with its own and that those actions were taken without the permission or knowledge of the customer. Duke asserts that those actions interfered with his efforts to obtain or retain Dixie's accounts.
Duke testified that, on some unspecified date, he and Kuntz met again and Kuntz asked Duke to provide the locations of Dixie's vending machines. According to Duke:
 "[B]asically, [Kuntz] wanted to talk a deal. And he wanted to make some kinds of arrangements. It was important for him to get the list [of the locations of the Dixie vending machines], so that he [would know] where the — I could understand why he wanted to identify the machines and where they [were] for the bank. He went on to try to work some kind of deal where possibly I could run Tom's [Foods] product or buy some Tom's [Foods] product and sell it through my machines. He thought it was more equitable or whatever, because I had all these machines in place, plus Duke Vending machines, plus, then Dixie Snax. And he'd like to see all those machines be partially full of Tom's [Foods products]. He'd be doing a lot more business than what he was at that particular time."
Duke testified that he believed Tom's Foods was legally entitled to know where Dixie's vending machines were located and that Duke needed to stop Tom's Foods from repossessing the machines in order to save his agreement with Dixie. Duke claimed that he had no problem selling Tom's Foods products in his or Dixie's *Page 451 
vending machines if doing so would save his agreement with Dixie.[14] Duke also testified that Kuntz promised to "back off" and to leave the vending machines alone, so that Duke had a chance to make his agreement with Dixie work, if Duke would tell Kuntz where all of Dixie's vending machines were located. According to Duke, Kuntz wanted the locations of the vending accounts only to verify the condition of the equipment and report back to STI. For these reasons, Duke provided to Kuntz a list of the locations of all of Dixie's vending machines.[15] Duke claimed that after Kuntz obtained the list of the locations of Dixie's vending machines, Tom's Foods employees began using the list to further their repossession efforts.
Tom's Foods claimed that it first learned of Duke's involvement with Dixie in late February. On March 7, 1997, Tom's Foods sent Duke a letter demanding that Duke stop using Dixie's vending machines because of the lien STI had on the machines.[16]
On March 14 and March 19, 1997, Tom's Foods again protested Duke's use of Dixie's vending machines.
Duke acknowledged at trial that, in February and March 1997, he and Tom's Foods were both competing to obtain the vending-machine accounts Dixie had abandoned. Duke, however, claimed that he was acting as an agent for Dixie and that he, therefore, had authority to service those accounts.[17]
Todd Mims testified at trial that Duke was servicing Dixie's vending accounts and using Dixie's vending machines until Duke and Dixie could finalize the purchase transaction. Mims testified that Duke was acting "as Dixie's agent" until the purchase transaction could be completed. Mims also testified that Duke was told that STI had a lien on Dixie's vending machines and that both he and Duke knew that the deal could not be consummated without the approval of STI and Tom's Foods.
On March 19, 1997, Duke's attorney notified Dixie's attorney that the purchase transaction was "off." According to the notes maintained by Dixie's attorney, Duke's attorney had advised Duke "not to proceed" with the proposed transaction *Page 452 
and had advised Duke "to return Dixie's vending machines." According to Duke, he continued to operate Duke's Vending for only a few months after the proposed Dixie-Duke purchase transaction fell through. He then abandoned his vending business and converted his Chapter 13 petition in bankruptcy to a Chapter 7 petition.
On December 16, 1997, Duke and Dixie sued Tom's Foods, alleging intentional interference with business or contractual relations. Both Dixie and Duke asserted that Tom's Foods had interfered with Dixie's attempt to sell its vending machines and its vending-machine accounts to Duke. Tom's Foods answered the complaint with a general denial. Tom's Foods also asserted affirmative defenses of justification and a legitimate economic motive and/or bona fide business competition. In its answer, Tom's Foods also asserted counterclaims alleging breach of contract, open account, account stated, wrongful detention, and conversion against Dixie, Ronnie Mims, and Todd Mims; those counterclaims arose out of numerous vending accounts, promissory notes, and leases executed in favor of Tom's Foods by Dixie and/or Ronnie Mims and Todd Mims. Tom's Foods alleged that its losses amounted to $208,386.18 plus attorney fees and costs.
On October 24, 2002, Tom's Foods moved for a judgment as a matter of law as to the claims asserted against it by Duke and Dixie. As to Dixie's claim of intentional interference, Tom's Foods argued that it was entitled to a judgment as a matter of law because, it argued, (1) STI and Dixie were parties to a business relationship involving Dixie's equipment, including the vending machines, (2) Tom's Foods was acting as STI's agent at all times relevant to the repossession and was legally justified in repossessing Dixie's vending machines, and (3) because Tom's Foods was acting as STI's agent, Tom's Foods was not a stranger to any of Dixie's dealings involving the vending machines or any of its other equipment.
As to Duke's claim of intentional interference, Tom's Foods argued that it was entitled to a judgment as a matter of law because, it argued, (1) Tom's Foods was acting as STI's agent in repossessing Dixie's vending machines (which Duke had not purchased at the time of the repossession), (2) Duke had no right to use Tom's Foods logos (that were apparently displayed on some of Dixie's machines) in its business, and (3) Tom's Foods was competing with Duke to obtain the abandoned Dixie vending-machine accounts and did not act wrongfully in pursuing those accounts. The trial court denied Tom's Foods' motion.
The case went to trial. At the close of the defendant's evidence, Dixie entered a stipulation of dismissal with prejudice as to its claim of intentional interference asserted against Tom's Foods; Tom's Foods also entered a stipulation of dismissal as to all counterclaims asserted against Dixie, Ronnie Mims, and Todd Mims. Duke's claim of intentional interference with business or contractual relations was the only claim submitted to the jury.
The jury returned a verdict in favor of Duke, awarding him $500,000 in compensatory damages and $4 million in punitive damages. Tom's Foods filed a motion for a new trial or, in the alternative, for a remittitur. Tom's Foods also filed a motion for a judgment as a matter of law, pursuant to Rule 50(b), Ala. R. Civ. P. The trial court denied Tom's Foods' postjudgment motion for a judgment as a matter of law. The trial court also denied Tom's Foods' postjudgment motion for a new trial, conditioned on Duke's accepting an order of remittitur of the punitive damages award from $4 million to $750,000. *Page 453 
Duke accepted the remittitur, and the trial court entered a judgment.
Tom's Foods appeals from the denial of its postjudgment motions, making the following arguments:
 "I. Duke's tortious interference claim fails as a matter of law.
 "II. Tom's Foods' conduct cannot be actionable because STI was acting within clear legal rights and Tom's [Foods] was STI's agent.
 "III. Duke failed to prove there was a business relationship between Dixie and Duke sufficient to support a tortious interference claim.
 "IV. A new trial is required because of the trial court's error in permitting prejudicial evidence regarding other lawsuits against Tom's [Foods].
 "V. A new trial is required because the compensatory damages award is speculative, not supported by the evidence, and excessive in all events.
 "VI. The punitive damages award, even as reduced by the trial court, is excessive under the facts and applicable federal and state standards."
Duke appeals from the trial court's order of remittitur, asserting that the original $4 million punitive-damages award was supported by the evidence and should be reinstated.
 Standard of Review
In Waddell Reed, Inc. v. United Investors Life InsuranceCo., 875 So.2d 1143, 1152 (Ala. 2003), this Court stated the standard to be applied when reviewing a trial court's ruling on a motion for a judgment as a matter of law:
 "When reviewing a ruling on a motion for a JML [judgment as a matter of law], this Court uses the same standard the trial court used initially in deciding whether to grant or deny the motion for a JML. Regarding questions of fact, the ultimate question is whether the nonmovant has presented sufficient evidence to allow the case to be submitted to the jury for a factual resolution. The nonmovant must have presented substantial evidence in order to withstand a motion for a JML. A reviewing court must determine whether the party who bears the burden of proof has produced substantial evidence creating a factual dispute requiring resolution by the jury. In reviewing a ruling on a motion for a JML, this Court views the evidence in the light most favorable to the nonmovant and entertains such reasonable inferences as the jury would have been free to draw. Regarding a question of law, however, this Court indulges no presumption of correctness as to the trial court's ruling."
(Citations omitted.)
 Discussion
In Parsons v. Aaron, 849 So.2d 932 (Ala. 2002), this Court discussed extensively the elements of the tort of intentional interference with business or contractual relations:
 "This Court recently recognized that to establish tortious interference with contractual or business relations a plaintiff must prove:
 "`"1) the existence of a contract or business relation; 2) the defendant's knowledge of the contract or business relation; 3) intentional interference by the defendant with the contract or business relation; 4) the absence of justification for the defendant's interference; and 5) damage to the plaintiff as a result of the interference."'
 "Ex parte Awtrey Realty Co., 827 So.2d 104, 108-09
(Ala. 2001), quoting Soap Co. v. Ecolab, Inc., 646 So.2d 1366, 1371 (Ala. 1994).
 "Justification has been recognized both as an element to be proved by the plaintiff and as an affirmative defense to *Page 454 
be pleaded and proved by the defendant. Compare Awtrey Realty, supra, and Pakruda v. Cross, 669 So.2d 907, 909 (Ala.Civ.App. 1995); BellSouth Mobility, Inc. v. Cellulink, Inc., 814 So.2d 203
(Ala. 2001). As we noted in BellSouth Mobility,'" it is illogical to continue to list an absence of justification as one of the elements of the plaintiff's cause of action and then to place the burden on the defendant to disprove it."' 814 So.2d at 212 n. 5, quoting Century 21 Academy Realty, Inc. v. Breland, 571 So.2d 296, 298 (Ala. 1990).
 "We agree with the language quoted in BellSouth Mobility. We reiterate that justification for interference with contractual or business relations is an affirmative defense to be pleaded and proved by the defendant.
 "In addition to the elements recited above, this Court has also recognized:
 "`"After proving the existence of a contract, it is essential to a claim of tortious interference with contractual relations that the plaintiff establish that the defendant is a `third party,' i.e., a `stranger' to the contract with which the defendant allegedly interfered." Atlanta Market Ctr. Management Co. v. McLane, 269 Ga. 604, 608, 503 S.E.2d 278, 282 (1998); see also Alcazar Amusement Co. v. Mudd Colley Amusement Co., 204 Ala. 509, 86 So. 209 (1920). This is so, because "a party to a contract cannot, as a matter of law, be liable for tortious interference with the contract." Lolley v. Howell, 504 So.2d 253, 255 (Ala. 1987).
 "`"One is not a stranger to the contract just because one is not a party to the contract. . . ." McLane, 269 Ga. at 608, 503 S.E.2d at 282 (emphasis added [in BellSouth Mobility]). As we recently stated in Colonial Bank v. Patterson, 788 So.2d 134
(Ala. 2000): "[W]hen tripartite relationships exist and disputes arise between two of the three parties, then a claim alleging interference by the third party that arises from conduct by the third party that is appropriate under its contract with the other two parties is not recognized.'"
"BellSouth Mobility, 814 So.2d at 212."
849 So.2d at 946-47.
In Waddell v. Reed, Inc., supra, this Court recognized that "[a] defendant is a party in interest to a [business or contractual] relationship if the defendant has any beneficial or economic interest in, or control over, that relationship." 875 So.2d at 1154. Waddell and Parsons also relied upon the case of Atlanta Market Center Management Co. v. McLane, 269 Ga. 604,608, 503 S.E.2d 278, 282 (1998). In Atlanta Market Center, the Supreme Court of Georgia stated:
 "One is not a stranger to the contract just because one is not a party to the contract, as it has been held that the alleged interferer is not a stranger to the contract and thus not liable for tortious interference where the alleged interferer was the agent for one of the parties to the contract . . . and all the purported acts of interference were done with the scope of the interferer's duties as agent. . . .
 "In Jefferson-Pilot Comm. Co. v. Phoenix City Broadcasting, 205 Ga.App. 57, 60, 421 S.E.2d 295
(1992), the shadow of liability for tortious interference was further diminished when the Court of Appeals reasoned that `all parties to a comprehensive interwoven set of contracts which provided for the financing, construction, and transfer of ownership' were not strangers, i.e., the purchaser of a radio station was not a stranger to the contractual relations between the radio station's seller and the seller's lenders. Thus, in order for a defendant to be *Page 455 
liable for tortious interference with contractual relations, the defendant must be a stranger to both the contract and the business relationship giving rise to and underpinning the contract. . . ."
269 Ga. at 608-09, 503 S.E.2d at 282-83.
 Duke's Claim that Tom's Foods Tortiously Interfered with the Purchase of Dixie's Vending Machines
Duke first claims that Tom's Foods tortiously interfered with his proposed purchase transaction with Dixie. Specifically, he alleges that Tom's Foods interfered with his purchase of Dixie's vending machines. We disagree because, based on the above-cited authorities, Tom's Foods was not a stranger to the contractual or business relationships involving Dixie and Duke and therefore cannot be liable for tortious interference with that relationship.
First, Tom's Foods, Dixie, and STI are "`all parties to a comprehensive interwoven set of contracts.'" See Atlanta MarketCenter, 269 Ga. at 609, 503 S.E.2d at 283. As established above, in accepting the assignment of the security agreements, STI retained a right of recourse against Tom's Foods in the event Dixie defaulted on the promissory notes. Thus, Tom's Foods had an economic interest in the relationship between STI and Dixie. SeeWaddell, supra.
Second, Tom's Foods was at all times acting as STI's agent and, for purposes of repossessing Dixie's vending machines, stood in the shoes of STI. STI had a legal right to repossess Dixie's equipment, including its vending machines. As STI's agent, Tom's Foods had no more and no less right than STI had. As STI's agent, Tom's Foods was within its right to repossess the vending machines and to collect the moneys from those machines because STI would have been within its rights to do so. See Parsons, supra; Atlanta Market Center, supra; and Colonial Bank v.Patterson, 788 So.2d 134 (Ala. 2000) (holding that a defendant could not be liable for tortious interference with a business relation where the defendant merely exercised its legal rights).
Third, Tom's Foods cannot be a stranger to the business relationship between Dixie and STI because Tom's Foods was involved in creating that relationship. Without the relationship between Tom's Foods and Dixie, which included a licensing agreement, a distributorship agreement, and a lender-borrower relationship (pursuant to which Tom's Foods remained liable even after the notes and security agreements were assigned to STI), STI would have had no relationship with Dixie. See, e.g.,Waddell, supra, Parsons, supra, and Atlanta Market Center, supra, and Jefferson-Pilot Comm. Co. v. Phoenix CityBroadcasting, 205 Ga.App. 57, 60, 421 S.E.2d 295 (1992).
Fourth, at all times relevant to this action, Duke was acting as Dixie's agent. Although Duke was contemplating the purchase of Dixie's vending machines, that purchase transaction had not been completed and could not be completed without the approval of both STI and Tom's Foods; neither of those entities had approved the proposed transaction. Thus, at all times relevant to this dispute, Duke was merely acting as an agent for Dixie. Therefore, Duke stood in Dixie's shoes and had no more right to retain the vending machines than did Dixie.
Under these facts, Tom's Foods, STI, Dixie, and Duke were all parties to an interwoven set of contracts and business relationships, and Tom's Foods cannot be liable for tortiously interfering with a contract or business relationship to which it is a party. Additionally, under Alabama law, Tom's Foods is insulated from liability for tortious interference as a result of its repossession *Page 456 
efforts, which were a lawful exercise of the legal rights of its principal. See Waddell, supra; Parsons, supra; AtlantaMarket Center, supra; and Bama Budweiser of Montgomery, Inc. v.Anheuser-Busch, Inc., 611 So.2d 238 (Ala. 1992). For these reasons, Tom's Foods actions in repossessing Dixie's vending machines cannot, as a matter of law, expose Tom's Foods to liability for tortious interference with Duke (Dixie's agent) and Dixie's business or contractual relationship, and the trial court erred in denying Tom's Foods' motion for a judgment as a matter of law on this aspect of Duke's claim.
 Duke's Allegations that Tom's Foods Interfered with Customer Accounts
Duke also claimed that, in addition to interfering with his purchase of Dixie's vending machines, Tom's Foods interfered with business relationships purportedly existing between Duke and Dixie's vending-account customers.[18] Duke alleged that, although STI held a lien on Dixie's vending machines and other equipment, Dixie "owned" its at-will accounts and had the unfettered right to sell them to Duke. Duke alleged that Dixie authorized Duke, as Dixie's agent, to service those accounts and that, as part of the proposed purchase transaction, Duke intended to purchase those accounts from Dixie. Duke also alleged that Tom's Foods wrongfully solicited the accounts by simply taking over account locations, in some cases without obtaining permission of the appropriate person or entity and simply replacing Dixie's repossessed vending machines (some of which, in fact, were owned by Duke) with those owned by Tom's Foods. Duke asserts that as a result of Tom's interference, Duke lost vending accounts.
These allegations cannot, as a matter of law, establish a viable claim of tortious interference with any business relationship existing between Duke, on the one hand, and Dixie's vending-account customers, on the other, for two reasons. First, we agree with Tom's Foods that "the Duke-Dixie proposal and whatever relations Duke had relative to Dixie's customers were all part of a set of `interwoven contractual arrangements.' "(Tom's Foods brief at p. 18.) We have already concluded that Tom's Foods had a legal right to repossess all of Dixie's vending machines, that both Tom's Foods and STI had to approve the proposed Dixie-Duke purchase transaction before it could be completed, and that Tom's Foods had a legitimate economic interest in the security agreements and promissory notes at issue. For those reasons, we held that Tom's Foods, STI, Dixie, and Duke were all party to a set of interwoven contracts and, therefore, that Tom's Foods could not be liable for tortious interference with the Dixie-Duke proposed purchase transaction as a result of its repossession efforts.
We also recognize that Duke had nothing more than a prospect of obtaining for himself all of Dixie's vending-account customers. As noted earlier, all of those accounts were "at will." An "at-will" contract is not property or an asset that can be bought and sold to the total exclusion of others.[19] Other than Dixie's vending machines, the most Duke could have expected to obtain from Dixie was a list of vending-account customers who had chosen to do *Page 457 
business with Dixie in the past. Duke then had the opportunity to work from that list and to attempt to convince those customers to allow Duke to serve as their next vending-service company. However, as a competitor, Tom's Foods was also free to work from that same list, which it obtained in connection with its repossession efforts.[20]
Our conclusion that the competition between Tom's Foods and Duke for the vending account customers' business was too interwoven with the repossession aspects of this case to constitute tortious interference with a business relation is further buttressed by the fact that Duke did not claim a separate category of damages attributable to the loss of Dixie's vending-account customers. The only damages Duke claimed at trial resulted from the failure to finalize the proposed Dixie-Duke purchase transaction; this transaction included the proposed purchase of Dixie's vending machines and Duke's list of its vending-account customers. Under the facts of this case, the purchase of the vending machines and the vending-account-customer list are all part of the same set of interwoven contracts. The evidence indicates that Tom's Foods had a lawful right to repossess Dixie's vending machines, and the exercise of that lawful right, in turn, disrupted Dixie's (or its agent's) opportunity to service those machines at account locations. Nothing in this rises to the level of tortious interference.
Second, even if Tom's Foods and Duke were not parties to a set of interwoven contracts, we conclude that the "competitor's privilege" would apply to refute Duke's allegation that Tom's Foods tortiously interfered with a business relationship existing between Dixie's vending-account customers and Duke. "The competitor's privilege applies when the contract involved is terminable at will or when the defendant causes a third person not to enter into a prospective contract with another who is his competitor." Soap Co. v. Ecolab, Inc., 646 So.2d 1366, 1369
(Ala. 1994). Restatement (Second) of Torts § 768 (1979) states:
 "(1) One who intentionally causes a third person not to enter into a prospective contractual relation with another who is his competitor or not to continue an existing contract terminable at will does not interfere improperly with the other's relation if
 "(a) the relation concerns a matter involved in the competition between the actor and the other and
"(b) the actor does not employ wrongful means and
 "(c) his action does not create or continue an unlawful restraint of trade and
 "(d) his purpose is at least in part to advance his interest in competing with the other.
 "(2) The fact that one is a competitor of another for the business of a third person does not prevent his causing a breach of an existing contract with the other from being an improper interference *Page 458 
if the contract is not terminable at will."
Comment b to § 768 states:
 "The rule stated in this Section is a special application of the factors determining whether an interference is improper or not, as stated in § 767.[21] One's privilege to engage in business and to compete with others implies a privilege to induce third persons to do their business with him rather than with his competitors. In order not to hamper competition unduly, the rule stated in this Section entitles one not only to seek to divert business from his competitors generally but also from a particular competitor. And he may seek to do so directly by express inducement as well as indirectly by attractive offers of his own goods or services."
Comment e to § 768 continues, discussing the "wrongful means" element of the competitor's privilege:
 "If the actor employs wrongful means, he is not justified under the rule stated in this Section. The predatory means discussed in § 767, Comment c, physical violence, fraud, civil suits and criminal prosecutions, are all wrongful in the situation covered by this Section. On the other hand, the actor may use persuasion and he may exert limited economic pressure. . . .
 "The rule stated in this Section rests on the belief that competition is a necessary or desirable incident of free enterprise. Superiority of power in the matters relating to competition is believed to flow from superiority in efficiency and service. If the actor succeeds in diverting business from his competitor by virtue of superiority in matters relating to their competition, he serves the purpose for which competition is encouraged."
We also note that the Alabama Supreme Court has quoted with approval the following interpretation of the "wrongful means" required to establish tortious interference with existing at-will contracts or to establish tortious interference with prospective contracts:
 "`Competitors and their allies are not necessarily gentlemen — or even scholars. Competition may be rough and tumble and even — within reasonable bounds — involve economic factors extraneous to the main competition itself. We do not believe a searching analysis only of motive is in most instances enough to send these cases to the jury. There must still under the Indiana cases be something "illegal" about the means employed.'"
Soap Co., 646 So.2d at 1370 (quoting with approval GreatEscape, Inc. v. Union City Body Co., 791 F.2d 532, 543 (7th Cir. 1986)).
Thus, the competitor's privilege recognizes some types of interference among rivals competing to obtain existing at-will accounts or prospective accounts. Also, in scrutinizing an alleged tortious interference with existing at-will accounts or with prospective business relations, it is not necessary to conduct a comprehensive inquiry into all of the actor's possible motives; all that is required is (1) that the *Page 459 
competitor engages in actions designed to further, at least in part, his own interests; (2) that those actions create no unlawful restraint of trade; and (3) that those actions do not involve wrongful means. Intense competition for at-will accounts alone, even to the point of attempting to ruin a rival and even when the interferer acts less than honorably, is insufficient.
Duke did not produce substantial evidence indicating that Tom's Foods used wrongful means in interfering with any prospective relationship with Dixie's vending-account customers. First, Duke admitted in his deposition that Tom's Foods repossession of any of his machines appeared to be the result of a mistake on Tom's Foods part. Despite the earlier deposition testimony that any repossession of his machines appeared to be by mistake, Duke argued at trial that Tom's Foods repossessed, by placing repossession stickers on, machines bearing "Doritos" stickers rather than Tom's Foods logos and, therefore, that Tom's Foods must have known that those vending machines did not belong to Dixie. Duke alleges that this constitutes evidence of Tom's Foods' wrongful motive and, thus, evidence of the wrongful means used by Tom's Foods to interfere with Duke's relationship with Dixie's vending-account customers. However, Duke then acknowledged that not all of Dixie's vending machines bore a Tom's Foods logo.
Second, it is significant that Duke failed to allege that any of Tom's Foods actions were directed at him instead of at Dixie. Duke does not allege that Tom's Foods said anything false or even derogatory about Duke to the vending customers. Duke did not call any of Dixie's former vending-account customers to testify that they were coerced or defrauded into doing business with Tom's Foods and, for all that appears in the record, those customers freely elected to do business with Tom's Foods.
Likewise, Duke does not allege that Tom's Foods set out to repossess vending machines belonging to Duke. The record contains no evidence indicating that Tom's Foods went into the Dothan area looking for Duke's machines; conversely, the record indicates that Tom's Foods set out to locate Dixie's vending machines and to repossess those machines on STI's behalf. Tom's Foods had every right to do so. Tom's Foods may have "repossessed" a few of Duke's vending machines, but there is no evidence to show that Tom's Foods intended to do so; from all appearances, Tom's Foods had no knowledge that Duke had replaced some of Dixie's machines with his own.[22]
We acknowledge that whether the means of interference used was wrongful or improper and, therefore, unjustified, is generally a question of fact. See, e.g., Gross v. Lowder Realty, 494 So.2d at 597 n. 3 (discussing the element of justification and the factors to be balanced in making this determination). Here, however, the only allegation is that Duke lost the opportunity to obtain vending accounts as a result of Tom's Foods' repossessing Dixie's vending machines, which it had the right to do, and by Tom's Foods' placing its own vending machines at those vending-account locations.[23] The record also establishes *Page 460 
that any contact Tom Foods had with vending machines owned by Duke appeared to be accidental and that Tom's Food did not intend to interfere with any of Duke's existing vending-account locations. Under the facts of this case, these allegations simply do not rise to the level of "wrongful means" required to establish the elements of the intentional tort of interference with contractual or business relations.
We conclude that the trial court erred in denying Tom's Foods motion for a judgment as a matter of law. In case no. 1021095, we reverse the judgment entered by the trial court and remand the cause for the trial court to enter a judgment in favor of Tom's Foods. We dismiss the appeal in case no. 1021155 as moot.
1021095 — REVERSED AND REMANDED WITH DIRECTIONS.
1021155 — APPEAL DISMISSED AS MOOT.
NABERS, C.J., and SEE, BROWN, and HARWOOD, JJ., concur.
[1] At the time Larry Duke filed the complaint in this action he was involved in a Chapter 13 bankruptcy proceeding, and the bankruptcy trustee was substituted as the proper plaintiff. However, for purposes of this opinion, we shall refer to Larry Duke as the plaintiff in this action.
[2] During this litigation, a dispute arose as to whether Tom's Foods' recourse obligation had expired before the events at issue in this litigation occurred. At trial, it was established that Tom's Foods and Stephens began negotiating in September 1996 regarding releasing Tom's Foods from this recourse obligation. However, those negotiations were not completed until September 1997. Thus, Tom's Foods' recourse obligation continued through the events made the basis of this litigation, and Tom's Foods was ultimately at risk in the event Dixie defaulted on the notes.
[3] The lease agreement defined "default" broadly and provided several events that would constitute a default under the lease. One such event was if "[Dixie] shall default under that certain Tom's Foods, Inc. Vending Program Agreement entered into by and between Lessee and Tom's Foods, Inc. or under any other agreement, note or account between Lessee and Tom's Foods, Inc."
[4] The parties also refer to STI as "SunTrust." The record is unclear whether STI and SunTrust are the same entity, whether STI changed its name to SunTrust, or whether SunTrust acquired STI or its assets. The parties ultimately refer to the holder of the promissory notes and the security agreements as "SunTrust." However, it appears that STI was the name of the secured party at the time of Dixie's default and the name of the entity involved in the relevant correspondence and communications with Dixie and Tom's Foods.
[5] The repossession stickers stated: "This machine has been repossessed by Tom's Foods, Inc. as an agent of STI Credit Corp. f/k/a Stephens Diversified Leasing, Inc. Questions, Call Tom's Foods, Inc. 706-323-2721, customer service."
[6] Kuntz left Tom's Foods employment on March 1, 1997. Although the record is unclear on this point, apparently, after Kuntz left another Tom's Foods employee was placed in charge of the TCO.
[7] Some of those accounts were no longer being serviced by Dixie or had not been serviced adequately by Dixie, because of the financial difficulties experienced by Dixie. However, Dixie's vending machines remained at the locations of the accounts.
[8] Duke was apparently experiencing his own financial difficulties, although he continued to operate his vending-machine business.
[9] Neither the record nor the testimony offered at trial indicates dates for many of the described events or agreements. Thus, we have no indication of the exact order of events or the exact date on which the agreements were purportedly entered into. We note that negotiations and dealings between Duke and Dixie appeared to span no more than 30 days. Thus, any of the events involving Tom's Foods and Duke or Tom's Foods' and Dixie's customers alleged to have occurred must have taken place within that time frame.
[10] It is unclear whether the terms Duke and Dixie orally agreed upon were the same as those later memorialized in a document entitled "Final Agreement." The terms of the "Final Agreement" were as follows:
 "The agreement between Duke's Vending and Dixie Snax, Inc. is to be as follows:
 "1. That Duke's Vending is to pay the $54,000 for the items that are represented in Exhibit `A' attached, or whatever payoff amount is due to Sun Trust Corporation. Any amounts over the $54,000 would be deducted from the amount in paragraph three. It is further understood that these terms are subject to full release of any liens or claims of ownership by Sun Trust and Tom's, Inc. relating to the merchandise listed in Exhibit `A.'
 "2. That Duke's Vending is to pay $17,000.00 for equipment listed as `Trucks and Office Equipment,' attached as Exhibit B.
 "3. That Duke's Vending is to pay $20,000.00 on or before April 12, 1997 and $10,000.00 on or before June 18th, 1997 as final payment for all remaining vending machines (Exhibit `C') not listed above and the right to work any existing accounts, subject to any deductions as stated in paragraph one.
 "4. That Dixie Snax, Inc., Todd, Ronnie and Frances Mims agree not to compete with Duke's Vending in a similar business, including but not limited to vending services and vending machines and merchandise, within a thirty mile radius of Dothan, Alabama for a period of three years."
This "Final Agreement" was never executed, and the transaction proposed in this agreement was never consummated.
[11] Duke testified that even before being contacted by Tom's Foods, he was aware that Tom's Foods was "in town." Duke stated that he knew Dixie had lost the big stores and that "Tom's [Foods] had more or less [taken] them over and was working them themselves. . . . And I had been seeing different Tom's [Foods] trucks around town. It was not hard to add up what was going on." It is unclear whether Duke was referring to the national chain accounts and over-the-counter businesses Dixie was required to service for Tom's Foods or whether Duke was referring to Tom's Foods' working Dixie's former accounts.
[12] On one occasion, Duke arrived at an account location as employees of Tom's Foods were loading Duke's machines onto a truck; Duke explained that those vending machines belonged to Duke and Tom's Foods left them at the account location. Duke also testified that two vending machines belonging to him remained unaccounted for. However, Duke had no knowledge of what happened to those machines, and he did not present any evidence indicating that Tom's Foods removed those machines.
[13] Duke testified that "[Tom's Foods] continued to pick machines up or turn them around and set their own machines in place. And they went to whatever means they had to to get in them to put their product back in, and more or less removed mine. I would find my product on tables or in trash cans or whatever. And some of these machines, I guess, they didn't have the right key or something, because they had crow-barred their way in to make that happen."
[14] According to Duke's testimony, Kuntz did not offer him a Tom's Foods distributorship; Kuntz just wanted to give Duke a good deal on Tom's Foods products and set up a relationship that would last over the years. Despite this testimony, Duke claims in his brief that Kuntz "fraudulently promis[ed] to make Duke a Tom's [Foods] distributor in exchange for his assistance in locating the remaining accounts." (Duke's brief at p. 46).
[15] At trial, Kuntz could recall very few of the details of his meetings with Duke. Kuntz did recall that Duke had expressed some interest in entering into a distributorship agreement with Tom's Foods; he also recalled that at some point before the end of February 1997, Duke turned over to Kuntz a list of Dixie's vending-account locations.
[16] Duke admitted that he received this letter before he and Dixie reached an agreement on the terms of the purchase transaction. This admission helps narrow the time frame in which the alleged events could have occurred. If Tom's Foods did not learn of Duke's involvement until the end of February, if Duke received Tom's Foods' March 7, 1997, letter before he and Dixie agreed on the terms of the proposed purchase transaction, and if Duke's attorney called off the proposed purchase transaction on March 19, any interference by Tom's Foods with the Dixie-Duke proposed transaction must have occurred within a two-week period, at most.
[17] No evidence was presented to establish that Dixie's vending-machine accounts were anything but "at will." In other words, no evidence was presented to establish that the accounts were awarded for a specified length of time or were governed by any written terms. Tom's Foods argued that the account locations could terminate Dixie — or any other vending-machine company — at will.
[18] The trial court agreed that Duke's allegations also presented a question whether Tom's Foods had interfered with the customer accounts in addition to presenting a question whether Tom's Foods had interfered with the purchase of the vending machines.
[19] This is so because the other party in an "at-will" contract is always free to obtain the service that is the subject of the contract from whomever it chooses or simply to discontinue the contract at any time.
[20] Not only did Tom's Foods have the right to solicit at-will accounts, but Duke's own testimony also established that Tom's Foods did not obtain the list of accounts wrongfully. Duke testified that he gave the list to Kuntz because Duke thought Tom's Foods had a right to the list; Duke also admitted that Tom's Foods did not promise him a franchise or distributorship agreement in exchange for the list. The only inference of wrongdoing alleged by Duke as to the method used by Kuntz in obtaining the list of vending accounts was Duke's claim that Kuntz promised that Tom's Foods would "back off" if Duke turned over the list. Such a promise is not actionable and does not, under the facts of this case, give rise to a claim of tortious interference.
[21] Restatement (Second) of Torts § 767 lists the following factors to be considered when determining whether a defendant's interference is justified:
"(a) the nature of the actor's conduct,
"(b) the actor's motive,
 "(c) the interests of the other with which the actor's conduct interferes,
 "(d) the interests sought to be advanced by the actor,
 "(e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,
 "(f) the proximity or remoteness of the actor's conduct to the interference, and
"(g) the relations between the parties."
[22] It is also striking that Duke turned over the list of Dixie's vending locations but failed to mention to Kuntz that he had replaced Dixie's machines at some of those locations with his own.
[23] Duke identified only four specific vending accounts with which he alleged interference. Of those four accounts, Duke lost only two — the account at Northview High School and the account at the peanut mill in Headland. Duke claimed that Tom's Foods repossessed Dixie's vending machines located at Northview High School by turning them around so that they were inaccessible to customers. According to Duke, Tom's Foods then replaced Dixie's machines with vending machines owned by Tom's Foods. Duke did not allege that the machines "repossessed" at Northview High School belonged to him. He claimed that he was servicing Dixie's equipment at the time of these events. Thus, any contact Duke had with Northview High School was as Dixie's agent.
Duke also complained that Tom's Foods placed a repossession sticker on one of his machines located at the peanut mill in Headland. Duke testified that Tom's Foods should have known that Dixie did not own that vending machine because it had a "Doritos" sticker on it rather than a Tom's Foods logo. However, Duke also acknowledged that not all of Dixie's vending machines bore Tom's Foods' stickers.